IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| GRISSELLE RAMOS, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 08 CV 2703 |
| PLAYTEX PRODUCTS, INC., RC2 CORPORATION, LEARNING CURVE BRANDS, INC., AND MEDELA, INC., | ) ) ) ) | Judge Lefkow |
| Defendants. | ) ) ) | |

## DEFENDANT LEARNING CURVE BRANDS, INC.'S MOTION FOR REASSIGNMENT AND CONSOLIDATION OF RELATED CASE

Defendant, Learning Curve Brands, Inc. by its counsel, hereby moves this Court pursuant to Federal Rule of Civil Procedure 42 and Local Rule 40.4 of the Northern District of Illinois to reassign and consolidate to this Court the related case pending before Magistrate Judge Brown, captioned *Smith et al. v. Playtex Products, Inc. et al.*, No. 08-CV-3352 (the "Smith Action")[1]. In support of this Motion, Learning Curve Brands, Inc. states as follows:

1.     On May 9, 2008, Wolf Haldenstein Adler Freeman & Herz LLC ("Wolf Haldenstein") filed a putative class action complaint on behalf of Grisselle Ramos against Playtex Products, Inc., RC2 Corporation, Learning Curve Brands, Inc., and Medela, Inc., captioned *Grisselle Ramos, et al. v. Playtex Products, Inc. et al*, No. 08-CV-2703 (the "Ramos Action"). The Ramos Action was assigned to this Court. (Pursuant to L.R. 40.4(c), a copy of the Complaint in the Ramos Action is attached hereto as *Exhibit A*)

---

[1]     As of the date this motion was filed, the docket reflects that only Defendant Learning Curve Brands, Inc. was served in this case.

2.    On May 15, 2008, the Wolf Haldenstein firm filed a second putative class action on behalf of three other named plaintiffs, Dina Scalia, Jennifer Suarez and Marissa Lopez, against Playtex Products, Inc., RC2 Corporation, Learning Curve Brands, Inc., and Medela, Inc. This second case is captioned as *Dina Scalia et al. v. Playtex Products, Inc. et al*, No. 08-CV-2828 (the "Scalia Action"). This Scalia Action was initially assigned to Judge John A. Nordberg. (Pursuant to L.R. 40.4(c), a copy of the Complaint in the Scalia Action is attached hereto as *Exhibit B*). The Scalia Action was virtually identical to the Ramos Action.

3.    On June 5, 2008, the Wolf Haldenstein firm filed Plaintiff's Uncontested Motion for Reassignment and Consolidation, which asked the Court to enter an Order finding that the Scalia Action is related to the Ramos Action under Local Rule 40.4, and that the Scalia Action be reassigned to Judge Lefkow's docket and consolidated with the Ramos Action.

4.    On June 10, 2008, the Court granted the Wolf Haldenstein firm's Uncontested Motion for Reassignment and Consolidation of the Scalia Action and issued a Finding of Relatedness Pursuant to Local Rule 40.4, requesting that the Executive Committee order the Scalia Action to be reassigned to this Court's calendar as a related case.

5.    On June 11, 2008, an Order of the Executive Committee was issued, ordering the Scalia Action to be reassigned to the calendar of this Court.

6.    On June 11, 2008, Hagens Berman Sobol Shapiro LLP filed a third putative class action complaint on behalf of Jessica Smith against Playtex Products, Inc., RC2 Corporation, Learning Curve Brands, Inc., and Medela, Inc., which other than allegations relating to the named plaintiff, is virtually identical to the two prior complaints filed by the Wolf Haldenstein firm.  This third case is captioned: *Jessica Smith et al. v. Playtex Products, Inc. et al*, No. 08 CV

2

3352 (the "Smith Action") and has been assigned to Judge Kendall. (Pursuant to L.R. 40.4(c), a copy of the Complaint in the Smith Action is attached hereto as *Exhibit C*).

7.       Since the Smith Action makes the identical allegations and claims as those made by the plaintiffs in the Ramos and Scalia Actions which have been reassigned as related cases and consolidated, it follows that the Smith Action is also related and should be reassigned and consolidated with the Ramos and Scalia Actions.

8.       Reassignment is appropriate where the requirements of L.R. 40.4 are met. *Popovich v. McDonald's Corp.*, 189 F. Supp.2d 772, 778 (N.D. Ill. 2002); see also *River Village West LLC v. People's Gas Light and Coke Co.*, 2007 WL 941548 (N.D. Ill.).

9.       The Smith Action is a related case under L.R. 40.4(a) because "the cases involve some of the same issues of fact or law;" "the cases grow out of the same transaction or occurrence;" and "one or more of the classes involved in the cases is or are the same." L.R. 40.4(a)(2-4). As noted above, the Complaint in the Smith Action is identical to the complaints in the earlier-filed Ramos and Scalia Actions. Therefore, the Smith Action is a related case under L.R. 40.4(a).

10.       The Smith Action also satisfies the requirement for reassignment as a related case set forth in L.R. 40.4(b) because: (1) the Smith Action and the Ramos Action are pending in the United States District Court for the Northern District of Illinois; (2) judicial economy would be served by having the cases heard by a single judge; (3) the cases *sub judice* have not progressed to the point where designating the later-filed Smith Class Action as related would be likely to delay the proceedings in the Ramos Class Action substantially as no answer has yet been filed and no discovery has been conducted; and (4) the cases are susceptible of disposition in a single proceeding.

11.    Pursuant to L.R. 40.4(c), this motion is properly being filed before the Court where the lowest-numbered related case is pending.

12.    Consolidation under Rule 42 of the Federal Rules of Civil Procedure is appropriate where there is a "common question of law or fact." Fed. R. Civ. P. 42(a). A comparison of the Complaint filed in the Smith Action to the Complaint filed in the Ramos Action reveals that the substantive allegations of law and fact in both complaints are substantially identical. Therefore, consolidation of the Smith Action with the Ramos and Scalia actions which have been previously consolidated, is appropriate. *Int'l Broth. of Teamsters Local 734 Health and Welfare Trust Fund v. Phillip Morris, Inc.* 34 F. Supp. 2d 656, 659 n.2 (N.D. Ill. 1998) ("The court has consolidated the actions since they raise completely identical questions of law and fact involving the same defendants.")

WHEREFORE, for the reasons set forth above, Learning Curve Brands, Inc. respectfully requests that the Court grant its Motion for Reassignment and Consolidation and enter an Order finding that the above-captioned case is related under L.R. 40.4 to the Smith Action, *Smith et al. v. Playtex Products, Inc. et al.*, No. 08-CV-3352, and that the Smith Action be reassigned to this Court and consolidated with the Ramos Action, *Grisselle Ramos et al. v. Playtex Products, Inc. et al.*, No. 08-CV-2703.

Respectfully submitted,

LEARNING CURVE BRANDS, INC.

s/ Bart T. Murphy
By one of its attorneys

Bart T. Murphy
Ice Miller LLP
2300 Cabot Dr., Suite 455
Lisle, IL 60532
630-955-6392

4

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that on June 26, 2008 he caused the foregoing to be filed with the Clerk of the United States District Court for the Northern District of Illinois and a copy of which will be served on the counsel listed below by the Clerk's ECF/CM system:

*Attorneys for Grisselle Ramos and Dina Scalia, et al.*
> Mary Jane Fait (fait@whafh.com)
> Theodore B. Bell (tbell@whafh.com)

*Attorneys for Jessica Smith*
> Elizabeth A. Fegan (beth@hbsslaw.com)
> Daniel J. Kurowski (dank@hbsslaw.com)
> Timothy P. Mahoney (timm@hbsslaw.com)

*Attorneys for Playtex Products, Inc.*
> Andrew Rothschild (arothschild@lewisrice.com)
> Richard B. Walsh, Jr. (rwalsh@lewisrice.com)
> Dexter G. Benoit (dbenoit@ngelaw.com)
> Robert E. Browne (rbrowne@ngelaw.com)

*Attorneys for Medela, Inc.*
> Susan M. Benton (sbenton@winston.com)
> Alexis MacDowall (amacdowall@winston.com)
> Charles W. Kierpiec (ckierpiec@winston.com)
> Kevin A. Banasik (kbanasik@winston.com)

> s/ Bart T. Murphy
> Bart T. Murphy
> Ice Miller LLP
> 2300 Cabot Dr., Ste,. 455
> Lisle, IL 60532
> (630) 955-6392

# EXHIBIT A

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| GRISSELLE RAMOS, on behalf of herself and all others similarly situated, ) | Civil Action No. |
| ) | |
| Plaintiff, ) | Judge |
| ) | |
| vs. ) | Mag. Judge |
| ) | |
| PLAYTEX PRODUCTS, INC., RC2 CORPORATION, LEARNING CURVE BRANDS, INC., and MEDELA, INC., ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendants. ) | |

### CLASS ACTION COMPLAINT

Plaintiff Grisselle Ramos ("Plaintiff"), on behalf of herself and all others similarly situated, by way of this Complaint against Defendants Playtex Products, Inc. ("Playtex), RC2 Brands, Inc. ("RC2"), Learning Curve Brands, Inc. ("Learning Curve") and Medela, Inc. ("Medela") (collectively "Defendants"), alleges as follows:

### I.    OVERVIEW

1.    Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased vinyl plastic baby products ("VPBPs") which contain lead and which were imported and/or distributed by Defendants. The VPBPs at issue include: a vinyl cooler for storing breast milk made by Medela; a carrying case for a First Years "Natural Transitions" breast pump made by RC2; and a Playtex "Fridge to Go" vinyl baby bottle cooler.

2.    Despite marketing their VPBPs as safe for young children, Defendants distributed VPBPs that are intended to hold milk to be ingested by newborns but that contain lead which is poisonous to children, especially if ingested.

1

3.     Defendants did so despite clear regulatory prohibitions on the use of lead in other children's products, their knowledge that the ingestion of lead by children can cause serious long-term injury, their prior experiences with the marketing and sale of children's toys tainted with lead paint, and their representations that the VPBPs are safe for children.

4.     High levels of lead were found in Defendants' VPBPs by an environmental group based in California, the Center for Environmental Health ("CEH"). CEH is recommending that parents discard the vinyl coolers and vinyl cases used for storing milk, or other infant products.

5.     Despite the CEH report, Defendants have not offered to reimburse Plaintiffs and the Class for the costs of the VPBPs. At one time, one Defendant (Medela) offered to replace the product, but only at some undetermined date in the future. Defendants are thus failing to compensate Plaintiffs and the Class for their damages or make them whole.

6.     As a result of Defendants' negligent and reckless conduct, Plaintiffs' children and the children of the Class have been significantly exposed to a known hazardous substance. As a result of such exposure, the children are at an increased risk of being poisoned by lead. Early detection, through medical testing, of lead poisoning is made necessary and advisable by the Defendants' manufacturing, marketing, and sale of the VPBPs tainted with lead.

7.     Accordingly, Plaintiffs bring this action to recover the actual and compensatory damages for themselves and the Class, as well as to recover the costs of diagnostic testing necessary to detect lead poisoning to their children resulting from Defendants' actions.

## II.     PARTIES

8.     Plaintiff Grisselle Ramos ("Plaintiff") is a citizen of the State of New Jersey, residing at 1167 N. 35th Street, Camden, New Jersey 08105. Plaintiff purchased one or more VPBPs based on Defendants' representations that the products are safe for children and are

2

intended to be used in connection with feeding infants. Plaintiff was deceived because Defendants could not have represented the VPBPs were safe had they truthfully disclosed that the products were made with lead. Plaintiff would never have purchased these VPBPs had she known her infant would be exposed to lead.

9.      Playtex, Inc. is a Delaware corporation with its principal place of business at 300 Nyala Farms Road, Westport, Connecticut 06880.

10.     RC2 Corporation is a Delaware corporation with its principal place of business located at 1111 W. 22nd Street, Suite 320, Oak Brook, Illinois 60523.

11.     Learning Curve Brands, Inc. is incorporated in Delaware, with its headquarters in Oak Brook, Illinois, and is a subsidiary of RC2. Learning Curve markets and sells what it purports to be "developmental toys that engage children, and provide parents with peace of mind, knowing their children are being inspired and enlightened by safe and quality playthings." Learning Curve brands include The First Years®, Lamaze®, John Deere Kids™, Thomas & Friends™ and Bob the Builder, among others. Learning Curve is responsible for the licensing, marketing, and distribution of the toys, collectibles, and infant and toddler and preschool products manufactured by RC2 Corporation. These products include the VPBPs at issue. In 2003, shortly after its acquisition by RC2 Corporation, Learning Curve Brands issued a recall of 3,800 activity toys due to unsafe levels of lead in the paint. Moreover, in 2007, Learning Curve issued two recalls for 1.5 million Thomas & Friends toys painted with red and yellow surface paint containing lead. Learning Curve was formerly known as The Ertl Company, Racing Champions, Ertl, Inc., RC Ertl, Inc. and RC2 Brands, Inc.

12.     Medela, Inc. is a Delaware corporation with its principal place of business located at 1101 Corporate Drive, McHenry, Illinois 60050.

3

### III.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because at least one member of the class is a citizen of a different State than the Defendants, there are 100 or more class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and cost.

14.    Venue is properly set in this District pursuant to 28 U.S.C. § 1391(a) because one or more Defendants reside, transact business, and are found within this District, and a substantial part of the events giving rise to the claims at issue in this Complaint arose in this District.

### IV.    FACTUAL ALLEGATIONS

**A.    VPBPs**

15.    Vinyl (the common name for the polymer polyvinyl chloride) is a versatile and durable material used in a variety of household products, including toys, children's accessories, and Defendants' VPBPs.

16.    Vinyl, to hold together, needs a metal as a binding agent. In the U.S., the metal of choice often is tin, calcium, barium or zinc. In fact, according to the Vinyl Institute, a trade group based in Arlington, Va., the vinyl industry in the United States stopped using lead in plastic years ago and instead uses tin, calcium, barium or zinc as a stabilizer to provide durability.

17.    But lead or cadmium—far more reactive and harmful—are cheaper. Thus, imported vinyl products from China and other overseas locations still contain lead.

**B.    Overview of Lead Poisoning**

**1.    Effects of lead on children**

18.    Lead in VPBPs is invisible to the naked eye and has no smell. Yet, lead is known to be very dangerous to human beings. Essentially, lead lodges in the bone or skeletal structure

4

of the body and certain events can cause it to latently move into the blood stream and cause significant difficulties.

19.     The U.S. Center for Disease Control has set a blood lead "level of concern" of a mere 10 micrograms per deciliter of blood (a microgram is 1/1,000,000th of a gram and a deciliter is 1/10th of a liter or about 1/10 of a quart), and new research suggests that serious health effects may begin to set in with blood levels as low as 5 micrograms per deciliter.

20.     On average, children under six will absorb and/or retain about 50 percent of the lead they ingest. Lead poisoning during the first three years of a child's life can critically impair brain and nervous system development. Young children are the most vulnerable to poisoning by lead, due in large part to the fact that their brains and nervous systems have yet to fully form. The direct effects of pediatric lead poisoning can include reading disabilities, attention deficit, hyperactivity, behavioral problems, stunted growth, hearing impairment and damage to the kidneys and greater demand for medical care generally to treat those problems. If exposed to higher levels, young children may suffer from mental retardation, fall into a coma, or die.

21.     Health officials figure lead use in gasoline and paints skimmed five to 10 IQ points from every child growing up in the United States in the 1970s. New research suggests that the so-called "natural" decline in mental capacity afflicting many older people is instead a function of lead exposure decades earlier, as children and young adults.

22.     The American Academy of Pediatrics has thus concluded that there is "no known safe level of lead exposure."

23.     Because the body absorbs lead over time, even small amounts of lead can have negative effects. There is no study that has established a blood level for lead that does not impair child cognition.

5

24.     Children can be exposed to lead through such things as contaminated dust, paint chips, or lead-based products. Children may be exposed to lead from consumer products through normal hand-to-mouth activity, which is part of their development. Children often place toys, fingers, and other objects in their mouth, exposing themselves to lead dust.

25.     According to the National Safety Council, it only takes the lead dust equivalent of a single grain of salt for a child to register an elevated blood lead level.

26.     A universally recognized method for testing lead levels is a blood test. The reliability of blood lead testing comes from, in part, the capability of comparing blood lead test results, especially for children, to the published standard of 10 µg/dl, established by the Center for Disease Control ("CDC").

27.     Blood lead testing is also useful in signaling a need for further medical examinations, which can lead to a more definite diagnosis.

    2.    **Effects of Lead Poisoning on Society**

28.     While it is clear that lead poisoning has a drastic effect on the children and families who suffer from its devastating physiological and neurological effects, there are public costs as well.

29.     The annual costs of environmentally attributable diseases in American children total $54.9 billion, of which the vast majority arises from lead poisoning. It is estimated that the total cost of lead poisoning in the U.S. each year is $43.4 billion. *See* Landrigan, Philip J. et al., "Environmental Pollutants and Disease in American Children: Estimates of Morbidity, Mortality, and Costs for Lead Poisoning, Asthma, Cancer, and Developmental Disabilities," Environmental Health Perspectives (Vol. 110, No. 7, July 2002).

6

### C.    Lead in Defendants' VPBPs

30.    High levels of lead were found in defendants' VPBPs by an environmental group based in California, the Center for Environmental Health ("CEH"), that spread the word about lead in vinyl baby bibs, lunchboxes, and other children's products.

31.    CEH purchased VPBPs in January 2008 from Target and Babies "R" Us stores in the San Francisco Area. CEH found a vinyl cooler for stored breast milk with high levels of lead from a "Pump in Style" breast pump made by Medela; also with high lead levels was a carrying case that came with a First Years "Natural Transitions" breast pump made by RC2 Brands, Inc., makers of Thomas and Friends products; and a Playtex "Fridge to Go" vinyl baby bottle cooler.

32.    CEH tested each of the VPBPs first with a hand-held metal detector and then at a laboratory. The products were found to have from 1,100 parts per million of lead to 5,500 parts per million of lead, the group says. CEH has informed the producers of the products. "Parents would never expect that when storing breast milk for their newborn, it could be contaminated by lead," said Michael Green, Executive Director of CEH. "There is no reason to have lead in baby products or anything used to hold breast milk for infants."

33.    CEH is recommending that parents discard the vinyl coolers and vinyl cases used for storing breast milk, pacifiers, or other infant products.

34.    Despite the obvious and serious dangers of lead contamination of infants, none of the Defendants has instituted a recall of the products.

### D.    Defendants' Knowledge of the Danger of Lead in Children's Products

35.    The Consumer Product Safety Commission ("CPSC") is supposed to take steps to prevent children from being exposed to hazardous lead and cadmium (and any other substance) in consumer products under the Consumer Product Safety Act ("CPSA"), 15 U.S.C. §§ 2051-84, and the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§ 1261-78.

36.     In 1978, the CPSC banned paint containing in excess of 0.06% lead by weight intended for consumer use. At the same time, it also banned toys and other articles intended for use by children that use paint with a lead content in excess of 0.06% because they present a risk of lead poisoning to young children. *See* 16 C.F.R. Part 1303.

37.     Both the United States House and Senate have passed versions of an amendment to the CPSA that would put a limit on the total amount of lead that could be in children's products, no matter the materials. The Senate amendment passed by a vote of 79-13, while the House amendment passed unanimously. Both the Senate and House versions would ultimately forbid the sale of products with levels of lead higher than 100 parts per million, levels which are exceeded by the Defendants' VPBPs *by 11 to 55 times*. *See* H.R. 4040; S. 2663.

38.     Since 1973, Illinois has prohibited the sale of any children's products containing lead at a level of 600 parts per million. *See* 410 ILCS 45 (Lead Poisoning Prevention Act). Legislation is currently under consideration in the Illinois General Assembly which would lower the permissible level to 40 parts per million. *See* Ill. H.B. 5705, 5789, S.B. 2868.

39.     Twenty-three other states have already enacted or are considering legislation setting permissible levels of lead well below the levels found in the vinyl coolers and cases. For example, legislation enacted in Washington state sets the permissible level of lead in children's products to a maximum of 90 parts per million, and possibly as low as 40 parts per million, *see* Wash. H.B. 2647, and similar legislation is under consideration in California, *see* Cal. A.B. 2694 (setting permissible level of lead at 40 parts per million).

40.     Thus, since at least 1973, Defendants have been on notice of the dangers of lead in children's products. Yet despite this knowledge, they continue to market products as "safe" when in fact they are not safe and contain lead.

8

E.    **Defendants' Marketing of VPBPs**

41.    Defendants' marketing campaigns are built around assuring parents that their products are safe for children.

42.    For example, on their website, RC2 and Learning Curve state:

a.    *"We understand that what matters most to parents is keeping their children healthy, happy and safe. What matters most to us is helping parents do just that by offering products for every stage of your child's development . . . ."*

b.    "Learning Curve offers developmental toys that engage children, and provide parents with peace of mind, knowing their children are being inspired and enlightened by *safe and quality playthings*." (emphasis supplied).

c.    "From breast pumps to pacifiers and sippy cups, The First Years by Learning Curve provides *high-value* feeding items to nurture your child." (emphasis supplied).

d.    *"Nothing is more important to us than ensuring that children's products are safe.* We take our product safety responsibilities very seriously, and the measure of our success is the trust parents are able to place in our products, knowing that we're taking the right steps to protect children." (emphasis supplied).

43.    On its website, Medela states, *inter alia*: "For over 25 years, it has been the commitment of Medela to provide the *highest quality breastfeeding and breast pumping products* available for mothers and professionals" (emphasis supplied).

44.    Playtex provides this Q&A on its website:

Q7.    What measures does Playtex maintain to regulate quality and safety?

A7.    Our global manufacturing facilities are monitored by our Quality Assurance team and expert engineers. The Quality Assurance team includes

9

experts with a minimum of 5 years of consumer product experience and a technical background.

\*             \*             \*

Q10. Are the plastics and materials in Playtex® Infant feeding and soothing products safe for food contact application?

A10. *All Playtex® Infant Care products contain materials that are safe for food contact application. We hold ourselves to a higher standard when it comes to infant safety.* Playtex conducts tests of its products, and we only release products for sale that surpass the most stringent domestic and international regulatory guidelines on this and other safety matters. All materials are tested to ensure functional safety and performance and are tested or certified to meet material safety standards. Material testing is performed by a third party laboratory. (emphasis supplied).

45.      However, despite their clear representations that the VPBPs were safe for children, Defendants distributed VPBPs tainted with lead.

**F.      The Class's Damages**

46.      The very children to which Defendants marketed their products as safe have now been exposed to poisonous lead that can cause serious long-term injury.

47.      Plaintiffs are not seeking some unspecified product from Defendants, but rather reimbursement for the cost of the defective and dangerous VPBPs. They are outraged that Defendants failed to determine that their baby products were contaminated by lead. Plaintiffs have no faith in the capacity of Defendants to provide a safe replacement product to their children and instead seek a full refund for the purchases made by them and the Class.

10

48.    Moreover, as a result of Defendants' negligent and reckless conduct, Plaintiffs' children and the Class have been significantly exposed to a known hazardous substance. As a result of such exposure, the children are at an increased risk of being poisoned by lead. Accordingly, Plaintiffs also seek to recover the costs of diagnostic testing necessary to detect lead poisoning to their children resulting from Defendants' actions.

## V.    CLASS ACTION ALLEGATIONS

49.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and a class ("Class") defined as:

> All persons or entities who purchased (a) a vinyl cooler for storing breast milk made by Medela; (b) a carrying case for a First Years "Natural Transitions" breast pump made by RC2; or (c) a Playtex "Fridge to Go" vinyl baby bottle cooler.

Excluded from the Class are Defendants and any entities in which Defendants have a controlling interest; any entities in which Defendants' officers, directors, or employees are employed and any of Defendants' legal representatives, heirs, successors, or assigns; the Judge to whom this case is assigned and any member of the Judge's immediate family; and all persons or entities who properly execute and timely file timely requests for exclusion from the Class.

50.    Plaintiff, on behalf of herself and the other members of the Class, seeks to recover damages and/or refunds from Defendants for consumer fraud under the Consumer Fraud laws of the 43 states and other state statutes for Defendants' false promises or concealment of material facts regarding the safety and composition of their VPBPs.

51.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23 of the Federal Rules of Civil Procedure.

11

52.     The requirement of Rule 23(a)(1) is satisfied here because the Class is so numerous that the individual joinder of all its members, in this or any action, is impracticable. The exact number or identification of Class members is presently unknown to Plaintiff, but it is believed that Class members number at least in the thousands. The identity of Class members is ascertainable. Class members may be informed of the pendency of this Class action by a combination of direct mail and public notice, or other means.

53.     The "commonality" requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact which are common to Plaintiff and each of the other members of the Class she seeks to represent. Those questions predominate over questions affecting only individual Class members. These questions include, but are not limited to:

    a.  Whether Defendants concealed, suppressed, or omitted any material fact with intent that consumers rely on such concealment, suppression, or omission in connection with the sale or advertisement of any merchandise;

    b.  Whether Plaintiff and the other members of the Class suffered any ascertainable loss of money or property as a result of Defendants' concealment, suppression, or omission of material fact;

    c.  Whether, as a result of Defendants' negligent and reckless conduct, children have been significantly exposed to a known hazardous substance;

    d.  Whether early detection, through medical testing of children, of lead poisoning is made necessary and advisable by the Defendants' manufacturing, marketing, and sale of the VPBPs;

    e.  Whether Defendants are refusing to pay for the costs of lead testing;

    f.  Whether Plaintiff and Class members are entitled to injunctive relief; and

12

g.  Whether Plaintiff and other members of the Class are entitled to recover damages, including refunds, treble damages, interest, attorneys' fees, filing fees, and reasonable costs of suit for Defendants' injury to them.

54.  Plaintiff's claims are typical of claims of the other Class members because they each arise from the same course of conduct by Defendants and are based on the same legal theories. Moreover, Plaintiff seeks the same forms of relief for herself as she does on behalf of absent Class members. Accordingly, Plaintiff has satisfied the "typicality" requirements of Rule 23(a)(3) with respect to the Class she seeks to represent.

55.  Because her claims are typical of the claims of the other Class members she seeks to represent, Plaintiff has every incentive to vigorously pursue those claims. Plaintiff has no conflicts with, or interests antagonistic to, the other Class members. Plaintiff's commitment to the vigorous prosecution of this action is reflected in her retention of competent counsel experienced in litigation of this nature to represent her and the other Class members. Plaintiff's counsel will fairly and adequately represent the interests of the proposed Class and (a) have identified and thoroughly investigated the claims set forth herein; (b) are highly experienced in the management and litigation of class actions and complex litigation in general, including litigation of similar types of claims; (c) have extensive knowledge of the applicable law; and (d) possess the resources to commit to the vigorous prosecution of this action on behalf of the proposed Class. Accordingly, Plaintiff satisfies the adequacy of representation requirements of Rule 23(a)(4) with respect to the proposed Class.

56.  In addition, this action meets the requirements of Rule 23(b)(1). Absent a representative class action, members of the proposed Class would continue to suffer the harms described herein, for which they would have no remedy. Even if separate actions could be

13

brought by individual Class members, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated Class members, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants.

57.    This action also meets the requirements of Rule 23(b)(2), in that Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making final injunctive or corresponding declaratory relief with respect to the Class appropriate.

58.    This action additionally meets the requirements of Rule 23(b)(3). Common questions of law or fact, including those enumerated above, exist as to the claims of all members of the Class and predominate over questions affecting only individual Class members, and a class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit large numbers of similarly-situated persons to prosecute their respective class claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. Furthermore, while damages to the Class are substantial in the aggregate, the damages to any individual Class member may be insufficient to justify individually controlling the prosecution of separate actions against Defendants.

59.    This case is manageable as a class action, and a class trial will be manageable. Notice may be provided to Class members by First Class United States Mail and/or through the alternative means of publication and the Internet.

14

## VI.    CLAIMS ALLEGED

### FIRST COUNT
### (Unfair and Deceptive Acts and Practices)

60.    Plaintiff incorporates the allegations contained in each of the above paragraphs as if fully set forth herein.

61.    The consumer protection and unfair and deceptive trade practices laws of 43 jurisdictions in the United States prohibit deceptive acts or practices in the conduct of any business trade or commerce or in the furnishing of any service and authorize a private right of action against defendants that violate those laws.[1]

62.    As alleged above, Defendants' course of conduct is deceptive, because Defendants failed to disclose that their VPBPs contained lead, which is likely to mislead or has the capacity to mislead consumers, including Plaintiff and the other members of the Class.

---

[1] The state statutes Defendants are alleged to have violated are: **Alaska** (Alaska Stat. §§ 45.50.471 *et seq.*); **Arizona** (Ariz. Rev. Stat. § 44-1522); **Arkansas** (Ark. Code. §§ 4-88-107 and 4-88-108); **California** (Cal. Civ. Code § 1770(a)(19) and Cal. Bus. & Prof. Code §§ 17200 and 17500); **Colorado** (Colo. Rev. Stat. § 6-1-105(u)); **Connecticut** (Conn. Gen. Stat. § 42-110(b); **Delaware** (6 Del. Code § 2513); **District of Columbia** (D.C. Code § 28-3904(e),(f)); **Florida** (F.S.A. § 501.204); **Hawaii** (Haw. Rev. Stat. § 480-2(a)); **Idaho** (Idaho Code § 48-603(17),(18)); **Illinois** (815 Ill. Comp. Stat. 505/2); **Indiana** (Ind. Code § 24-5-0.5-3(a)); **Kansas** (Kan. Stat. §§ 50-626(a),(b) and 50-627(a)); **Kentucky** (Ky. Rev. Stat. § 367.170); **Maine** (Me. Rev. Stat. tit. 5, § 207); **Maryland** (Md. Code Com. Law § 13-301(1),(3)); **Massachusetts** (Mass. Gen. Laws ch. 93A, §§ 2(a) and 9); **Michigan** (Mich. Stat. § 445.903(1)(s),(bb),(cc)); **Minnesota** (Minn. Stat. §§ 8.31 and 325F.67 and 325F.69(1)); **Missouri** (Mo. Rev. Stat. § 407.020); **Nebraska** (Neb. Rev. Stat. § 59-1602); **Nevada** (N.R.S. 598-0915(5),(15) and 598.0923(2)); **New Hampshire** (N.H. Rev. Stat. § 358-A:2); **New Jersey** (N.J.S.A. § 56:8-2; **New Mexico** (N.M.S.A. §§ 57-12-2(14),(17) and 57-12-3); **New York** (N.Y. Gen. Bus. Law § 349); **North Carolina** (N.C. Gen. Stat. §§ 75-1.1); **North Dakota** (N.D. Cent. Code §§ 51-15-02); **Ohio** (Ohio Rev. Code §§ 1345-02(A) and 1345-03(A) and 4165.02(7),(11) and §4165.03); **Oklahoma** (Okla. Stat. tit. 15, §§ 752 and 733 and tit. 78, § 53(9)); **Oregon** (Or. Rev. Stat. §§ 646.607(1) and 646.608(1)(i),(t),(u) and 646.608(2)); **Pennsylvania** (73 P.S. §201-2(1)(ix), 201-2(4)(xiv)); **Rhode Island** (R.I. Gen. Laws §§ 6-13.1-1(6)(ix),(xiii),(xiv) and 6-13.1-2); **South Dakota** (S.D. Codified Laws § 37-24-6(1)); **Tennessee** (Tenn. Code Ann. § 47-18-104(a)); **Texas** (Tex. Bus. & Com. Code Ann. §§ 17.46(b)(9),(24) and 17.50); **Utah** (UCA 1953 §§ 13-11-4(1) and 13-11-5(1)); **Vermont** (Vt. Stat. Ann. tit. 9, § 2453(a)); **Washington** (RCWA §§ 19.86.020 and 19.86.920); **West Virginia** (W.Va. Code §§ 46A-6-102(b)(I),(L),(M) and 46A-6-104); **Wisconsin** (W.S.A. §§ 100.18 and 100.195 and 100.20 and 100.207); and **Wyoming** (WS § 40-12-105(a)(x),(xv)).

15

63.    As alleged above, Defendants omitted material facts about their VPBPs, with the intent that Plaintiff and the other members of the Class would rely on such omissions.

64.    Defendants' conduct violates the consumer protection and unfair and deceptive acts and practices laws of each of the 43 jurisdictions at issue, and their deceptive acts and practices are continuing and will continue unless they are permanently enjoined. Plaintiff and members of the Consumer Protection Class have suffered injury as a direct and proximate result of Defendants' conduct, and Defendants are liable for compensatory and treble or other punitive damages, costs and attorneys' fees as each respective jurisdiction may permit, in amounts to be proved at trial.

65.    As alleged above, Defendants' course of conduct is also unfair: Defendants' conduct caused Plaintiff and the other members of the Class unjustified, substantial injuries which they could not avoid because of Defendants' material omissions; or such actions offend public policy, are immoral, unscrupulous, unethical, and offensive, and thereby cause substantial injury to consumers, including Plaintiff and the other members of the Class.

66.    Plaintiff and the other members of the Class have each suffered injury in fact and monetary loss as a direct and proximate result of Defendants' conduct, including but not limited to, the monies paid to purchase their VPBPs. But for Defendants' course of conduct, including the misrepresentations and/or omissions alleged above, Plaintiff and the other members of the Class would have not purchased Defendants' VPBPs.

67.    Plaintiff and the other members of the Class are entitled to legal and equitable relief for Defendants' violation of each of the foregoing statutes, including, as applicable, damages, restitution, and/or disgorgement of all revenues, earnings, profits, compensation, and

16

benefits which Defendants may have obtained from their above-described unlawful course of conduct, and an Order enjoining Defendants to cease and desist from engaging in those practices.

## SECOND COUNT
### (Breach of Implied Warranty)

68.     Count II is brought by Plaintiffs, individually, and on behalf of all similarly situated residents of Alaska, Arkansas, Colorado, Delaware, Hawaii, Louisiana, Maine, Maryland, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia and Wyoming (hereinafter "Implied Warranty Subclass"). Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

69.     At all times, there were in effect the following statutes governing the implied warranty of merchantability: Alaska Stat. § 45.02.314; Ark. Code Ann § 4-2 314; C.R.S. § 4-2-314; 6 Del. C. § 2-314; H.R.S. § 490:2-314; § 554.2314; 11 M.R.S.A. § 2 314; Md. Code Ann. Art. 95B § 2-314; Mass. Gen. Laws Ch. 106 § 2-314; Miss. Code. Ann. § 75-2-314; M.C.A. 30-2-314; Neb. U.C.C. 2-314; N.R.S. 104.2314; N.J.S.A. 12A:2-314; N.D.C.C. 2-314; O.S. 1991 § 2-314; R.I. Gen. Laws 1956 §6A-2-314; S.C. Code Ann. § 36-2-314; S.D.C.L. 57A-2-314; Tex. Bus. & Com. Code Ann. § 2-314; Va. Code § 8.2-314; W. Va. Code § 46-2-314; and Wyo. Stat. 34.1-2-314.

70.     As designers, manufacturers, producers, marketers and sellers of toys, collectibles and juvenile and baby products, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

71.     The VPBPs are "goods," as defined in various states' commercial codes governing the implied warranty of merchantability.

17

72.    Implied in the sale of the VPBPs is a warranty of merchantability that requires, among other things, that the VPBPs pass without objection in the trade and are of merchantable quality and safe and fit for such use by young children.

73.    Because the VPBPs are defective and inherently dangerous, as a result of containing lead, the VPBPs are not able to function in their ordinary capacities and were therefore not merchantable at the times they were sold, as impliedly warranted by Defendants.

74.    Due to Defendants' wrongful conduct as alleged herein, Plaintiffs and members of the Class could not have known about the risks associated with the VPBPs.

75.    By virtue of the CEH's announcements and direct contact by the CEH, Defendants were put on notice of the defect in the VPBPs.

76.    Defendants were also put on notice of the defect in the VPBPs by the numerous inquiries that they received concerning the defects.

77.    As a direct and proximate result of the Defendants' breach of implied warranty, Plaintiffs and members of the Class suffered damages as alleged herein.

## THIRD COUNT
### (Negligence)

78.    Count III is brought by all Plaintiffs, individually and on behalf of the Class. Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

79.    Defendants had a duty to exercise reasonable care in the design, manufacture, sale, and/or distribution of the VPBPs into the stream of commerce, including a duty to assure that these products did not expose children to adverse health effects including, without limitation, IQ deficits, learning disabilities, behavioral problems, stunted growth or slowed growth, impaired hearing, kidney damage, mental retardation, and even death from lead poisoning.

18

80.    Defendants failed to exercise ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, and/or distribution of the VPBPs into interstate commerce in that Defendants knew or should have known that the VPBPs created a high risk of adverse health effects which can cause extraordinary suffering and even death. Defendants' failure to exercise reasonable care in the design, manufacture, sale, and/or distribution of the VPBPs was grossly negligent.

81.    Specifically, Defendants were grossly negligent in the design, manufacture, testing, advertising, warning, marketing, and/or sale of the VPBPs in that they:

    a.  Failed to use due care in designing and manufacturing the relevant products so as to avoid the aforementioned risks to children;

    b.  Failed to accompany their products with proper warnings regarding all possible adverse effects associated with young children's handling and mouthing of, and otherwise being exposed to, the relevant products;

    c.  Failed to conduct adequate testing and post-marketing surveillance to determine the safety of the relevant products;

    d.  Failed to warn Plaintiffs and members of the Class prior to actively encouraging the sale of the VPBPs either directly or indirectly, orally or in writing, about the following: (1) the possibility that young children handling or otherwise exposed to the VPBPs could suffer adverse health effects as described herein, and/or (2) the possibility of affected children requiring hospitalization and/or continuous medical monitoring as a result of exposure to the VPBPs; and

    e.  Were otherwise careless or grossly negligent.

19

82.     Despite the fact that Defendants knew or should have known that the VPBPs could cause unreasonable, adverse health effects to children, Defendants continued to market the relevant products to consumers including Plaintiff despite the possibility that these products could be produced without lead.

83.     Defendants knew or should have known that consumers such as Plaintiffs and the Class would foreseeably suffer adverse health effects and injury as a result of Defendants' failure to exercise ordinary care as described above.

84.     Defendants' negligence was a proximate cause of Plaintiffs' and the Class' economic damages, as well as their children's increased risk of harm as previously set forth herein.

## FOURTH COUNT
### (Unjust Enrichment)

85.     Plaintiff incorporates the allegations contained in each of the above paragraphs as if fully set forth herein.

86.     Defendants have received a benefit from Plaintiff and the other members of the Class in the form of the monies Defendants received from Plaintiff's and other Class members' purchases of their VPBPs during the period of time relevant to this action.

87.     Defendants have knowingly appreciated and accepted this benefit which has resulted and continues to result in an inequity to Plaintiff and the other members of the Class.

88.     Defendants' appreciation and acceptance of this benefit is inequitable.

89.     As a result of Defendants' unjust enrichment, Plaintiff and the other members of the Class sustained damages in an amount to be determined at trial. Plaintiff and the other members of the Class seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

WHEREFORE, Plaintiff, on behalf of herself and the other members of the Class, respectfully requests that the Court enter judgment against Defendants as follows:

a.      Entering an Order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, certifying the above-defined Class, and finding that Plaintiff is a proper Class representative, and that her counsel is adequate Class counsel;

b.      Entering an Order requiring Defendants to disgorge and make restitution for their unjust enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged above;

c.      Entering an Order requiring Defendants to pay damages in the amount of monies paid for the VPBPs, damages in the amount of monies paid or to be paid for lead testing of the children exposed to the VPBPs, as well as actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

d.      Ordering Defendants to pay Plaintiff's costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

e.      Such other relief as the Court may deem just.

Dated: May 9, 2008                         **WOLF, HALDENSTEIN, ADLER,**
                                           **FREEMAN & HERZ, LLC**


                                    By:    /s/ Mary Jane Fait
                                           Mary Jane Fait
                                           Adam J. Levitt
                                           Theodore B. Bell
                                           55 West Monroe Street, Suite 1111
                                           Chicago, Illinois 60603
                                           (312) 984-0000

                                           *Attorneys for Plaintiff*

21

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the other members of the Class, hereby demands a jury trial on all claims so triable in this action.

Dated:  May 9, 2008

        **WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ, LLC**

        By:   /s/ Mary Jane Fait
            Mary Jane Fait
            Adam J. Levitt
            Theodore B. Bell
            WOLF HALDENSTEIN ADLER
             FREEMAN & HERZ LLC
            55 West Monroe Street, Suite 1111
            Chicago, Illinois  60603
            (312) 984-0000

            *Attorneys for Plaintiff*

# **EXHIBIT B**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DINA SCALIA, JENNIFER SUAREZ and MARISSA LOPEZ, on behalf of themselves and all others similarly situated, | Civil Action No. |
| | Judge |
| Plaintiffs, | Mag. Judge |
| vs. | **JURY TRIAL DEMANDED** |
| PLAYTEX PRODUCTS, INC., RC2 CORPORATION, LEARNING CURVE BRANDS, INC., and MEDELA, INC., | **FILED:    MAY 15, 2008** |
| | **08CV2828                AEE** |
| | **JUDGE NORDBERG** |
| Defendants. | **MAGISTRATE JUDGE ASHMAN** |

### CLASS ACTION COMPLAINT

Plaintiffs, Dina Scalia, Jennifer Suarez, and Marissa Lopez (collectively "Plaintiffs'), on behalf of themselves and all others similarly situated, by way of this Complaint against Defendants Playtex Products, Inc. ("Playtex), RC2 Brands, Inc. ("RC2"), Learning Curve Brands, Inc. ("Learning Curve") and Medela, Inc. ("Medela") (collectively "Defendants"), alleges as follows:

### I.    OVERVIEW

1.      Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased vinyl plastic baby products ("VPBPs") which contain lead and which were imported and/or distributed by Defendants. The VPBPs at issue include: a vinyl cooler for storing breast milk made by Medela; a carrying case for a First Years "Natural Transitions" breast pump made by RC2; and a Playtex "Fridge to Go" vinyl baby bottle cooler.

1

2.     Despite marketing their VPBPs as safe for young children, Defendants distributed VPBPs that are intended to hold milk to be ingested by newborns but that contain lead which is poisonous to children, especially if ingested.

3.     Defendants did so despite clear regulatory prohibitions on the use of lead in other children's products, their knowledge that the ingestion of lead by children can cause serious long-term injury, their prior experiences with the marketing and sale of children's toys tainted with lead paint, and their representations that the VPBPs are safe for children.

4.     High levels of lead were found in Defendants' VPBPs by an environmental group based in California, the Center for Environmental Health ("CEH"). CEH is recommending that parents discard the vinyl coolers and vinyl cases used for storing milk, or other infant products.

5.     Despite the CEH report, Defendants have not offered to reimburse Plaintiffs and the Class for the costs of the VPBPs. At one time, one Defendant (Medela) offered to replace the product, but only at some undetermined date in the future. Defendants are thus failing to compensate Plaintiffs and the Class for their damages or make them whole.

6.     As a result of Defendants' negligent and reckless conduct, Plaintiffs' children and the children of the Class have been significantly exposed to a known hazardous substance. As a result of such exposure, the children are at an increased risk of being poisoned by lead. Early detection, through medical testing, of lead poisoning is made necessary and advisable by the Defendants' manufacturing, marketing, and sale of the VPBPs tainted with lead.

7.     Accordingly, Plaintiffs bring this action to recover the actual and compensatory damages for themselves and the Class, as well as to recover the costs of diagnostic testing necessary to detect lead poisoning to their children resulting from Defendants' actions.

2

## II.    PARTIES

8.     Plaintiff Dina Scalia ("Scalia") was at all relevant times a resident of Buzzards Bay, Massachusetts.

9.     Plaintiff Jennifer Suarez ("Suarez") was at all relevant times a resident of Liverpool, New York.

10.    Plaintiff Marissa Lopez ("Lopez") was at all relevant times a resident of Los Angeles, California.

11.    Plaintiffs purchased one or more VPBPs based on Defendants' representations that the products are safe for children and are intended to be used in connection with feeding infants. Plaintiffs were deceived because Defendants could not have represented the VPBPs were safe had they truthfully disclosed that the products were made with lead. Plaintiffs would have never purchased these VPBPs had they known their infants would be exposed to lead.

12.    Playtex, Inc. is a Delaware corporation with its principal place of business at 300 Nyala Farms Road, Westport, Connecticut 06880.

13.    RC2 Corporation is a Delaware corporation with its principal place of business located at 1111 W. 22nd Street, Suite 320, Oak Brook, Illinois 60523.

14.    Learning Curve Brands, Inc. is incorporated in Delaware, with its headquarters in Oak Brook, Illinois, and is a subsidiary of RC2. Learning Curve markets and sells what it purports to be "developmental toys that engage children, and provide parents with peace of mind, knowing their children are being inspired and enlightened by safe and quality playthings." Learning Curve brands include The First Years®, Lamaze®, John Deere Kids™, Thomas & Friends™ and Bob the Builder, among others. Learning Curve is responsible for the licensing, marketing, and distribution of the toys, collectibles, and infant and toddler and preschool

3

products manufactured by RC2 Corporation. These products include the VPBPs at issue. In 2003, shortly after its acquisition by RC2 Corporation, Learning Curve Brands issued a recall of 3,800 activity toys due to unsafe levels of lead in the paint. Moreover, in 2007, Learning Curve issued two recalls for 1.5 million Thomas & Friends toys painted with red and yellow surface paint containing lead. Learning Curve was formerly known as The Ertl Company, Racing Champions, Ertl, Inc., RC Ertl, Inc. and RC2 Brands, Inc.

15.     Medela, Inc. is a Delaware corporation with its principal place of business located at 1101 Corporate Drive, McHenry, Illinois 60050.

### III.    JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because at least one member of the class is a citizen of a different State than the Defendants, there are 100 or more class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and cost.

17.     Venue is properly set in this District pursuant to 28 U.S.C. § 1391(a) because one or more Defendants reside, transact business, and are found within this District, and a substantial part of the events giving rise to the claims at issue in this Complaint arose in this District.

### IV.    FACTUAL ALLEGATIONS

#### A.    VPBPs

18.     Vinyl (the common name for the polymer polyvinyl chloride) is a versatile and durable material used in a variety of household products, including toys, children's accessories, and Defendants' VPBPs.

19.     Vinyl, to hold together, needs a metal as a binding agent. In the U.S., the metal of choice often is tin, calcium, barium or zinc. In fact, according to the Vinyl Institute, a trade group

4

based in Arlington, Va., the vinyl industry in the United States stopped using lead in plastic years ago and instead uses tin, calcium, barium or zinc as a stabilizer to provide durability.

20.    But lead or cadmium—far more reactive and harmful—are cheaper. Thus, imported vinyl products from China and other overseas locations still contain lead.

**B.    Overview of Lead Poisoning**

**1.    Effects of lead on children**

21.    Lead in VPBPs is invisible to the naked eye and has no smell. Yet, lead is known to be very dangerous to human beings. Essentially, lead lodges in the bone or skeletal structure of the body and certain events can cause it to latently move into the blood stream and cause significant difficulties.

22.    The U.S. Center for Disease Control has set a blood lead "level of concern" of a mere 10 micrograms per deciliter of blood (a microgram is 1/1,000,000th of a gram and a deciliter is 1/10th of a liter or about 1/10 of a quart), and new research suggests that serious health effects may begin to set in with blood levels as low as 5 micrograms per deciliter.

23.    On average, children under six will absorb and/or retain about 50 percent of the lead they ingest. Lead poisoning during the first three years of a child's life can critically impair brain and nervous system development. Young children are the most vulnerable to poisoning by lead, due in large part to the fact that their brains and nervous systems have yet to fully form. The direct effects of pediatric lead poisoning can include reading disabilities, attention deficit, hyperactivity, behavioral problems, stunted growth, hearing impairment and damage to the kidneys and greater demand for medical care generally to treat those problems. If exposed to higher levels, young children may suffer from mental retardation, fall into a coma, or die.

24.    Health officials figure lead use in gasoline and paints skimmed five to 10 IQ points from every child growing up in the United States in the 1970s. New research suggests that

5

the so-called "natural" decline in mental capacity afflicting many older people is instead a function of lead exposure decades earlier, as children and young adults.

25.     The American Academy of Pediatrics has thus concluded that there is "no known safe level of lead exposure."

26.     Because the body absorbs lead over time, even small amounts of lead can have negative effects. There is no study that has established a blood level for lead that does not impair child cognition.

27.     Children can be exposed to lead through such things as contaminated dust, paint chips, or lead-based products. Children may be exposed to lead from consumer products through normal hand-to-mouth activity, which is part of their development. Children often place toys, fingers, and other objects in their mouth, exposing themselves to lead dust.

28.     According to the National Safety Council, it only takes the lead dust equivalent of a single grain of salt for a child to register an elevated blood lead level.

29.     A universally recognized method for testing lead levels is a blood test. The reliability of blood lead testing comes from, in part, the capability of comparing blood lead test results, especially for children, to the published standard of 10 g/dl, established by the Center for Disease Control ("CDC").

30.     Blood lead testing is also useful in signaling a need for further medical examinations, which can lead to a more definite diagnosis.

## 2.     Effects of Lead Poisoning on Society

31.     While it is clear that lead poisoning has a drastic effect on the children and families who suffer from its devastating physiological and neurological effects, there are public costs as well.

6

32.    The annual costs of environmentally attributable diseases in American children total $54.9 billion, of which the vast majority arises from lead poisoning. It is estimated that the total cost of lead poisoning in the U.S. each year is $43.4 billion. *See* Landrigan, Philip J. et al., "Environmental Pollutants and Disease in American Children: Estimates of Morbidity, Mortality, and Costs for Lead Poisoning, Asthma, Cancer, and Developmental Disabilities," Environmental Health Perspectives (Vol. 110, No. 7, July 2002).

**C.    Lead in Defendants' VPBPs**

33.    High levels of lead were found in defendants' VPBPs by an environmental group based in California, the Center for Environmental Health ("CEH"), that spread the word about lead in vinyl baby bibs, lunchboxes, and other children's products.

34.    CEH purchased VPBPs in January 2008 from Target and Babies "R" Us stores in the San Francisco Area. CEH found a vinyl cooler for stored breast milk with high levels of lead from a "Pump in Style" breast pump made by Medela; also with high lead levels was a carrying case that came with a First Years "Natural Transitions" breast pump made by RC2 Brands, Inc., makers of Thomas and Friends products; and a Playtex "Fridge to Go" vinyl baby bottle cooler.

35.    CEH tested each of the VPBPs first with a hand-held metal detector and then at a laboratory. The products were found to have from 1,100 parts per million of lead to 5,500 parts per million of lead, the group says. CEH has informed the producers of the products. "Parents would never expect that when storing breast milk for their newborn, it could be contaminated by lead," said Michael Green, Executive Director of CEH. "There is no reason to have lead in baby products or anything used to hold breast milk for infants."

36.    CEH is recommending that parents discard the vinyl coolers and vinyl cases used for storing breast milk, pacifiers, or other infant products.

7

37.    Despite the obvious and serious dangers of lead contamination of infants, none of
the Defendants has instituted a recall of the products.

**D.    Defendants' Knowledge of the Danger of Lead in Children's Products**

38.    The Consumer Product Safety Commission ("CPSC") is supposed to take steps to
prevent children from being exposed to hazardous lead and cadmium (and any other substance)
in consumer products under the Consumer Product Safety Act ("CPSA"), 15 U.S.C. §§ 2051-84,
and the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§ 1261-78.

39.    In 1978, the CPSC banned paint containing in excess of 0.06% lead by weight
intended for consumer use. At the same time, it also banned toys and other articles intended for
use by children that use paint with a lead content in excess of 0.06% because they present a risk
of lead poisoning to young children. *See* 16 C.F.R. Part 1303.

40.    Both the United States House and Senate have passed versions of an amendment
to the CPSA that would put a limit on the total amount of lead that could be in children's
products, no matter the materials. The Senate amendment passed by a vote of 79-13, while the
House amendment passed unanimously. Both the Senate and House versions would ultimately
forbid the sale of products with levels of lead higher than 100 parts per million, levels which are
exceeded by the Defendants' VPBPs *by 11 to 55 times*. *See* H.R. 4040; S. 2663.

41.    Since 1973, Illinois has prohibited the sale of any children's products containing
lead at a level of 600 parts per million. *See* 410 ILCS 45 (Lead Poisoning Prevention Act).
Legislation is currently under consideration in the Illinois General Assembly which would lower
the permissible level to 40 parts per million. *See* Ill. H.B. 5705, 5789, S.B. 2868.

42.    Twenty-three other states have already enacted or are considering legislation
setting permissible levels of lead well below the levels found in the vinyl coolers and cases. For
example, legislation enacted in Washington state sets the permissible level of lead in children's

products to a maximum of 90 parts per million, and possibly as low as 40 parts per million, *see* Wash. H.B. 2647, and similar legislation is under consideration in California, *see* Cal. A.B. 2694 (setting permissible level of lead at 40 parts per million).

43.     Thus, since at least 1973, Defendants have been on notice of the dangers of lead in children's products. Yet despite this knowledge, they continue to market products as "safe" when in fact they are not safe and contain lead.

      **E.     Defendants' Marketing of VPBPs**

44.     Defendants' marketing campaigns are built around assuring parents that their products are safe for children.

45.     For example, on their website, RC2 and Learning Curve state:

    a.  *"We understand that what matters most to parents is keeping their children healthy, happy and safe.* What matters most to us is helping parents do just that by offering products for every stage of your child's development . . . ."

    b.  "Learning Curve offers developmental toys that engage children, and provide parents with peace of mind, knowing their children are being inspired and enlightened by *safe and quality playthings*." (emphasis supplied).

    c.  "From breast pumps to pacifiers and sippy cups, The First Years by Learning Curve provides *high-value* feeding items to nurture your child." (emphasis supplied).

    d.  *"Nothing is more important to us than ensuring that children's products are safe.* We take our product safety responsibilities very seriously, and the measure of our success is the trust parents are able to place in our products, knowing that we're taking the right steps to protect children." (emphasis supplied).

9

46. On its website, Medela states, *inter alia*: "For over 25 years, it has been the commitment of Medela to provide the *highest quality breastfeeding and breast pumping products* available for mothers and professionals" (emphasis supplied).

47. Playtex provides this Q&A on its website:

Q7. What measures does Playtex maintain to regulate quality and safety?

A7. Our global manufacturing facilities are monitored by our Quality Assurance team and expert engineers. The Quality Assurance team includes experts with a minimum of 5 years of consumer product experience and a technical background.

\*                    \*                    \*

Q10. Are the plastics and materials in Playtex® Infant feeding and soothing products safe for food contact application?

A10. *All Playtex® Infant Care products contain materials that are safe for food contact application. We hold ourselves to a higher standard when it comes to infant safety.* Playtex conducts tests of its products, and we only release products for sale that surpass the most stringent domestic and international regulatory guidelines on this and other safety matters. All materials are tested to ensure functional safety and performance and are tested or certified to meet material safety standards. Material testing is performed by a third party laboratory. (emphasis supplied).

48. However, despite their clear representations that the VPBPs were safe for children, Defendants distributed VPBPs tainted with lead.

10

### F.    The Class's Damages

49.    The very children to which Defendants marketed their products as safe have now been exposed to poisonous lead that can cause serious long-term injury.

50.    Plaintiffs are not seeking some unspecified product from Defendants, but rather reimbursement for the cost of the defective and dangerous VPBPs. They are outraged that Defendants failed to determine that their baby products were contaminated by lead. Plaintiffs have no faith in the capacity of Defendants to provide a safe replacement product to their children and instead seek a full refund for the purchases made by them and the Class.

51.    Moreover, as a result of Defendants' negligent and reckless conduct, Plaintiffs' children and the Class have been significantly exposed to a known hazardous substance. As a result of such exposure, the children are at an increased risk of being poisoned by lead. Accordingly, Plaintiffs also seek to recover the costs of diagnostic testing necessary to detect lead poisoning to their children resulting from Defendants' actions.

## V.    CLASS ACTION ALLEGATIONS

52.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a class ("Class") defined as:

> All persons or entities who purchased (a) a vinyl cooler for storing breast milk made by Medela; (b) a carrying case for a First Years "Natural Transitions" breast pump made by RC2; or (c) a Playtex "Fridge to Go" vinyl baby bottle cooler.

Excluded from the Class are Defendants and any entities in which Defendants have a controlling interest; any entities in which Defendants' officers, directors, or employees are employed and any of Defendants' legal representatives, heirs, successors, or assigns; the Judge to whom this

11

case is assigned and any member of the Judge's immediate family; and all persons or entities who properly execute and timely file timely requests for exclusion from the Class.

53.     Plaintiffs, on behalf of themselves and the other members of the Class, seek to recover damages and/or refunds from Defendants for consumer fraud under the Consumer Fraud laws of the 43 states and other state statutes for Defendants' false promises or concealment of material facts regarding the safety and composition of their VPBPs.

54.     This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23 of the Federal Rules of Civil Procedure.

55.     The requirement of Rule 23(a)(1) is satisfied here because the Class is so numerous that the individual joinder of all its members, in this or any action, is impracticable. The exact number or identification of Class members is presently unknown to Plaintiffs, but it is believed that Class members number at least in the thousands. The identity of Class members is ascertainable. Class members may be informed of the pendency of this Class action by a combination of direct mail and public notice, or other means.

56.     The "commonality" requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact which are common to Plaintiffs and each of the other members of the Class they seek to represent. Those questions predominate over questions affecting only individual Class members. These questions include, but are not limited to:

> a. Whether Defendants concealed, suppressed, or omitted any material fact with intent that consumers rely on such concealment, suppression, or omission in connection with the sale or advertisement of any merchandise;

12

b.  Whether Plaintiffs and the other members of the Class suffered any ascertainable loss of money or property as a result of Defendants' concealment, suppression, or omission of material fact;

c.  Whether, as a result of Defendants' negligent and reckless conduct, children have been significantly exposed to a known hazardous substance;

d.  Whether early detection, through medical testing of children, of lead poisoning is made necessary and advisable by the Defendants' manufacturing, marketing, and sale of the VPBPs;

e.  Whether Defendants are refusing to pay for the costs of lead testing;

f.  Whether Plaintiffs and Class members are entitled to injunctive relief; and

g.  Whether Plaintiffs and other members of the Class are entitled to recover damages, including refunds, treble damages, interest, attorneys' fees, filing fees, and reasonable costs of suit for Defendants' injury to them.

57.     Plaintiffs' claims are typical of claims of the other Class members because they each arise from the same course of conduct by Defendants and are based on the same legal theories. Moreover, Plaintiffs seeks the same forms of relief for themselves as they do on behalf of absent Class members. Accordingly, Plaintiffs have satisfied the "typicality" requirements of Rule 23(a)(3) with respect to the Class they seek to represent.

58.     Because their claims are typical of the claims of the other Class members they seek to represent, Plaintiffs have every incentive to vigorously pursue those claims. Plaintiffs have no conflicts with, or interests antagonistic to, the other Class members. Plaintiffs' commitment to the vigorous prosecution of this action is reflected in their retention of competent counsel experienced in litigation of this nature to represent them and the other Class members.

13

Plaintiffs' counsel will fairly and adequately represent the interests of the proposed Class and (a) have identified and thoroughly investigated the claims set forth herein; (b) are highly experienced in the management and litigation of class actions and complex litigation in general, including litigation of similar types of claims; (c) have extensive knowledge of the applicable law; and (d) possess the resources to commit to the vigorous prosecution of this action on behalf of the proposed Class. Accordingly, Plaintiffs satisfy the adequacy of representation requirements of Rule 23(a)(4) with respect to the proposed Class.

59.     In addition, this action meets the requirements of Rule 23(b)(1). Absent a representative class action, members of the proposed Class would continue to suffer the harms described herein, for which they would have no remedy. Even if separate actions could be brought by individual Class members, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated Class members, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants.

60.     This action also meets the requirements of Rule 23(b)(2), in that Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making final injunctive or corresponding declaratory relief with respect to the Class appropriate.

61.     This action additionally meets the requirements of Rule 23(b)(3). Common questions of law or fact, including those enumerated above, exist as to the claims of all members of the Class and predominate over questions affecting only individual Class members, and a class action is the superior method for the fair and efficient adjudication of this controversy.

14

Class treatment will permit large numbers of similarly-situated persons to prosecute their respective class claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. Furthermore, while damages to the Class are substantial in the aggregate, the damages to any individual Class member may be insufficient to justify individually controlling the prosecution of separate actions against Defendants.

62.     This case is manageable as a class action, and a class trial will be manageable. Notice may be provided to Class members by First Class United States Mail and/or through the alternative means of publication and the Internet.

## VI.    CLAIMS ALLEGED

### FIRST COUNT
### (Unfair and Deceptive Acts and Practices)

63.     Plaintiffs incorporate the allegations contained in each of the above paragraphs as if fully set forth herein.

64.     The consumer protection and unfair and deceptive trade practices laws of 43 jurisdictions in the United States prohibit deceptive acts or practices in the conduct of any business trade or commerce or in the furnishing of any service and authorize a private right of action against defendants that violate those laws.[1]

---

[1] The state statutes Defendants are alleged to have violated are: **Alaska** (Alaska Stat. §§ 45.50.471 *et seq.*); **Arizona** (Ariz. Rev. Stat. § 44-1522); **Arkansas** (Ark. Code. §§ 4-88-107 and 4-88-108); **California** (Cal. Civ. Code § 1770(a)(19) and Cal. Bus. & Prof. Code §§ 17200 and 17500); **Colorado** (Colo. Rev. Stat. § 6-1-105(u)); **Connecticut** (Conn. Gen. Stat. § 42-110(b); **Delaware** (6 Del. Code § 2513); **District of Columbia** (D.C. Code § 28-3904(e),(f)); **Florida** (F.S.A. § 501.204); **Hawaii** (Haw. Rev. Stat. § 480-2(a)); **Idaho** (Idaho Code § 48-603(17),(18)); **Illinois** (815 Ill. Comp. Stat. 505/2); **Indiana** (Ind. Code § 24-5-0.5-3(a)); **Kansas** (Kan. Stat. §§ 50-626(a),(b) and 50-627(a)); **Kentucky** (Ky. Rev. Stat. § 367.170); **Maine** (Me. Rev. Stat. tit. 5, § 207); **Maryland** (Md. Code Com. Law § 13-(continued...)

15

65.     As alleged above, Defendants' course of conduct is deceptive, because Defendants failed to disclose that their VPBPs contained lead, which is likely to mislead or has the capacity to mislead consumers, including Plaintiffs and the other members of the Class.

66.     As alleged above, Defendants omitted material facts about their VPBPs, with the intent that Plaintiffs and the other members of the Class would rely on such omissions.

67.     Defendants' conduct violates the consumer protection and unfair and deceptive acts and practices laws of each of the 43 jurisdictions at issue, and their deceptive acts and practices are continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the Consumer Protection Class have suffered injury as a direct and proximate result of Defendants' conduct, and Defendants are liable for compensatory and treble or other punitive damages, costs and attorneys' fees as each respective jurisdiction may permit, in amounts to be proved at trial.

68.     As alleged above, Defendants' course of conduct is also unfair: Defendants' conduct caused Plaintiffs and the other members of the Class unjustified, substantial injuries

---

(...continued)

301(1),(3)); **Massachusetts** (Mass. Gen. Laws ch. 93A, §§ 2(a) and 9); **Michigan** (Mich. Stat. § 445.903(1)(s),(bb),(cc)); **Minnesota** (Minn. Stat. §§ 8.31 and 325F.67 and 325F.69(1)); **Missouri** (Mo. Rev. Stat. § 407.020); **Nebraska** (Neb. Rev. Stat. § 59-1602); **Nevada** (N.R.S. 598-0915(5),(15) and 598.0923(2)); **New Hampshire** (N.H. Rev. Stat. § 358-A:2); **New Jersey** (N.J.S.A. § 56:8-2); **New Mexico** (N.M.S.A. §§ 57-12-2(14),(17) and 57-12-3); **New York** (N.Y. Gen. Bus. Law § 349); **North Carolina** (N.C. Gen. Stat. §§ 75-1.1); **North Dakota** (N.D. Cent. Code §§ 51-15-02); **Ohio** (Ohio Rev. Code §§ 1345-02(A) and 1345-03(A) and 4165.02(7),(11) and §4165.03); **Oklahoma** (Okla. Stat. tit. 15, §§ 752 and 733 and tit. 78, § 53(9)); **Oregon** (Or. Rev. Stat. §§ 646.607(1) and 646.608(1)(i),(t),(u) and 646.608(2)); **Pennsylvania** (73 P.S. §201-2(1)(ix), 201-2(4)(xiv)); **Rhode Island** (R.I. Gen. Laws §§ 6-13.1-1(6)(ix),(xiii),(xiv) and 6-13.1-2); **South Dakota** (S.D. Codified Laws § 37-24-6(1)); **Tennessee** (Tenn. Code Ann. § 47-18-104(a)); **Texas** (Tex. Bus. & Com. Code Ann. §§ 17.46(b)(9),(24) and 17.50); **Utah** (UCA 1953 §§ 13-11-4(1) and 13-11-5(1)); **Vermont** (Vt. Stat. Ann. tit. 9, § 2453(a)); **Washington** (RCWA §§ 19.86.020 and 19.86.920); **West Virginia** (W.Va. Code §§ 46A-6-102(b)(I),(L),(M) and 46A-6-104); **Wisconsin** (W.S.A. §§ 100.18 and 100.195 and 100.20 and 100.207); and **Wyoming** (WS § 40-12-105(a)(x),(xv)).

16

which they could not avoid because of Defendants' material omissions; or such actions offend public policy, are immoral, unscrupulous, unethical, and offensive, and thereby cause substantial injury to consumers, including Plaintiffs and the other members of the Class.

69.    Plaintiffs and the other members of the Class have each suffered injury in fact and monetary loss as a direct and proximate result of Defendants' conduct, including but not limited to, the monies paid to purchase their VPBPs. But for Defendants' course of conduct, including the misrepresentations and/or omissions alleged above, Plaintiffs and the other members of the Class would have not purchased Defendants' VPBPs.

70.    Plaintiffs and the other members of the Class are entitled to legal and equitable relief for Defendants' violation of each of the foregoing statutes, including, as applicable, damages, restitution, and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which Defendants may have obtained from their above-described unlawful course of conduct, and an Order enjoining Defendants to cease and desist from engaging in those practices.

## SECOND COUNT
### (Breach of Implied Warranty)

71.    Count II is brought by Plaintiffs, individually, and on behalf of all similarly situated residents of Alaska, Arkansas, Colorado, Delaware, Hawaii, Louisiana, Maine, Maryland, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia and Wyoming (hereinafter "Implied Warranty Subclass"). Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

72.    At all times, there were in effect the following statutes governing the implied warranty of merchantability: Alaska Stat. § 45.02.314; Ark. Code Ann § 4-2 314; C.R.S. § 4-2-314; 6 Del. C. § 2-314; H.R.S. § 490:2-314; § 554.2314; 11 M.R.S.A. § 2 314; Md. Code Ann.

17

Art. 95B § 2-314; Mass. Gen. Laws Ch. 106 § 2-314; Miss. Code. Ann. § 75-2-314; M.C.A. 30-2-314; Neb. U.C.C. 2-314; N.R.S. 104.2314; N.J.S.A. 12A:2-314; N.D.C.C. 2-314; O.S. 1991 § 2-314; R.I. Gen. Laws 1956 §6A-2-314; S.C. Code Ann. § 36-2-314; S.D.C.L. 57A-2-314; Tex. Bus. & Com. Code Ann. § 2-314; Va. Code § 8.2-314; W. Va. Code § 46-2-314; and Wyo. Stat. 34.1-2-314.

73.    As designers, manufacturers, producers, marketers and sellers of toys, collectibles and juvenile and baby products, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

74.    The VPBPs are "goods," as defined in various states' commercial codes governing the implied warranty of merchantability.

75.    Implied in the sale of the VPBPs is a warranty of merchantability that requires, among other things, that the VPBPs pass without objection in the trade and are of merchantable quality and safe and fit for such use by young children.

76.    Because the VPBPs are defective and inherently dangerous, as a result of containing lead, the VPBPs are not able to function in their ordinary capacities and were therefore not merchantable at the times they were sold, as impliedly warranted by Defendants.

77.    Due to Defendants' wrongful conduct as alleged herein, Plaintiffs and members of the Class could not have known about the risks associated with the VPBPs.

78.    By virtue of the CEH's announcements and direct contact by the CEH, Defendants were put on notice of the defect in the VPBPs.

79.    Defendants were also put on notice of the defect in the VPBPs by the numerous inquiries that they received concerning the defects.

80.    As a direct and proximate result of the Defendants' breach of implied warranty, Plaintiffs and members of the Class suffered damages as alleged herein.

### THIRD COUNT
### (Negligence)

81.    Count III is brought by all Plaintiffs, individually and on behalf of the Class. Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

82.    Defendants had a duty to exercise reasonable care in the design, manufacture, sale, and/or distribution of the VPBPs into the stream of commerce, including a duty to assure that these products did not expose children to adverse health effects including, without limitation, IQ deficits, learning disabilities, behavioral problems, stunted growth or slowed growth, impaired hearing, kidney damage, mental retardation, and even death from lead poisoning.

83.    Defendants failed to exercise ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, and/or distribution of the VPBPs into interstate commerce in that Defendants knew or should have known that the VPBPs created a high risk of adverse health effects which can cause extraordinary suffering and even death. Defendants' failure to exercise reasonable care in the design, manufacture, sale, and/or distribution of the VPBPs was grossly negligent.

84.    Specifically, Defendants were grossly negligent in the design, manufacture, testing, advertising, warning, marketing, and/or sale of the VPBPs in that they:

        a.    Failed to use due care in designing and manufacturing the relevant products so as to avoid the aforementioned risks to children;

    b.  Failed to accompany their products with proper warnings regarding all possible adverse effects associated with young children's handling and mouthing of, and otherwise being exposed to, the relevant products;

    c.  Failed to conduct adequate testing and post-marketing surveillance to determine the safety of the relevant products;

    d.  Failed to warn Plaintiffs and members of the Class prior to actively encouraging the sale of the VPBPs either directly or indirectly, orally or in writing, about the following: (1) the possibility that young children handling or otherwise exposed to the VPBPs could suffer adverse health effects as described herein, and/or (2) the possibility of affected children requiring hospitalization and/or continuous medical monitoring as a result of exposure to the VPBPs; and

    e.  Were otherwise careless or grossly negligent.

85.    Despite the fact that Defendants knew or should have known that the VPBPs could cause unreasonable, adverse health effects to children, Defendants continued to market the relevant products to consumers including Plaintiffs despite the possibility that these products could be produced without lead.

86.    Defendants knew or should have known that consumers such as Plaintiffs and the Class would foreseeably suffer adverse health effects and injury as a result of Defendants' failure to exercise ordinary care as described above.

87.    Defendants' negligence was a proximate cause of Plaintiffs' and the Class' economic damages, as well as their children's increased risk of harm as previously set forth herein.

## FOURTH COUNT
### (Unjust Enrichment)

88.    Plaintiffs incorporate the allegations contained in each of the above paragraphs as if fully set forth herein.

89.    Defendants have received a benefit from Plaintiffs and the other members of the Class in the form of the monies Defendants received from Plaintiffs' and other Class members' purchases of their VPBPs during the period of time relevant to this action.

90.    Defendants have knowingly appreciated and accepted this benefit which has resulted and continues to result in an inequity to Plaintiffs and the other members of the Class.

91.    Defendants' appreciation and acceptance of this benefit is inequitable.

92.    As a result of Defendants' unjust enrichment, Plaintiffs and the other members of the Class sustained damages in an amount to be determined at trial. Plaintiffs and the other members of the Class seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the other members of the Class, respectfully request that the Court enter judgment against Defendants as follows:

a.    Entering an Order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, certifying the above-defined Class, and finding that Plaintiffs are proper Class representatives, and that their counsel is adequate Class counsel;

b.    Entering an Order requiring Defendants to disgorge and make restitution for their unjust enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged above;

c.    Entering an Order requiring Defendants to pay damages in the amount of monies paid for the VPBPs, damages in the amount of monies paid or to be paid for lead testing of the

children exposed to the VPBPs, as well as actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

    d.    Ordering Defendants to pay Plaintiffs' costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

    e.    Such other relief as the Court may deem just.

Dated: May 15, 2008

          **WOLF, HALDENSTEIN, ADLER,**
          **FREEMAN & HERZ, LLC**

          By:___ /s/ Mary Jane Fait _____
               Mary Jane Fait
               Adam J. Levitt
               Theodore B. Bell
               55 West Monroe Street, Suite 1111
               Chicago, Illinois  60603
               (312) 984-0000

               *Attorneys for Plaintiffs*

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| JESSICA SMITH, on behalf of herself and all others similarly situated, | ) ) ) Civil Action No. |
|  | ) Judge |
| Plaintiff, | ) |
| vs. | ) Mag. Judge |
|  | ) |
| PLAYTEX PRODUCTS, INC., RC2 CORPORATION, LEARNING CURVE BRANDS, INC., and MEDELA, INC., | ) **JURY TRIAL DEMANDED** ) ) FILED: JUNE 11, 2008 |
|  | ) 08CV3352 |
| Defendants. | ) JUDGE KENDALL |
|  | ) MAGISTRATE JUDGE BROWN |

**CLASS ACTION COMPLAINT**

PH ·

Plaintiff Jessica Smith ("Plaintiff"), on behalf of herself and all others similarly situated,

by way of this Complaint against Defendants Playtex Products, Inc. ("Playtex), RC2 Brands, Inc.

("RC2"), Learning Curve Brands, Inc. ("Learning Curve") and Medela, Inc. ("Medela")

(collectively "Defendants"), alleges as follows:

## I.    OVERVIEW

1.    Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), (b)(1), (b)(2)

and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased vinyl

plastic baby products ("VPBPs") which contain lead and which were imported and/or distributed

by Defendants. The VPBPs at issue include: a vinyl cooler for storing breast milk made by

Medela; a carrying case for a First Years "Natural Transitions" breast pump made by RC2; and a

Playtex "Fridge to Go" vinyl baby bottle cooler.

2.    Despite marketing their VPBPs as safe for young children, Defendants distributed

VPBPs that are intended to hold milk to be ingested by newborns but that contain lead which is

poisonous to children, especially if ingested.

244280V1

3.      Defendants did so despite clear regulatory prohibitions on the use of lead in other children's products, their knowledge that the ingestion of lead by children can cause serious long-term injury, their prior experiences with the marketing and sale of children's toys tainted with lead paint, and their representations that the VPBPs are safe for children.

4.      High levels of lead were found in Defendants' VPBPs by an environmental group based in California, the Center for Environmental Health ("CEH"). CEH is recommending that parents discard the vinyl coolers and vinyl cases used for storing milk, or other infant products.

5.      Despite the CEH report, Defendants have not offered to reimburse Plaintiffs and the Class for the costs of the VPBPs. At one time, one Defendant (Medela) offered to replace the product, but only at some undetermined date in the future. Defendants are thus failing to compensate Plaintiffs and the Class for their damages or make them whole.

6.      As a result of Defendants' negligent and reckless conduct, Plaintiffs' children and the children of the Class have been significantly exposed to a known hazardous substance. As a result of such exposure, the children are at an increased risk of being poisoned by lead. Early detection, through medical testing, of lead poisoning is made necessary and advisable by the Defendants' manufacturing, marketing, and sale of the VPBPs tainted with lead.

7.      Accordingly, Plaintiffs bring this action to recover the actual and compensatory damages for themselves and the Class, as well as to recover the costs of diagnostic testing necessary to detect lead poisoning to their children resulting from Defendants' actions.

## II.     PARTIES

8.      Plaintiff Jessica Smith ("Plaintiff") is a citizen of the State of California, residing at 919 Levering Avenue, Los Angeles, California  90024. Plaintiff purchased one or more VPBPs based on Defendants' representations that the products are safe for children and are

intended to be used in connection with feeding infants. Plaintiff was deceived because Defendants could not have represented the VPBPs were safe had they truthfully disclosed that the products were made with lead. Plaintiff would never have purchased these VPBPs had she known her infant would be exposed to lead.

9.     Playtex, Inc. is a Delaware corporation with its principal place of business at 300 Nyala Farms Road, Westport, Connecticut 06880.

10.     RC2 Corporation is a Delaware corporation with its principal place of business located at 1111 W. 22nd Street, Suite 320, Oak Brook, Illinois 60523.

11.     Learning Curve Brands, Inc. is incorporated in Delaware, with its headquarters in Oak Brook, Illinois, and is a subsidiary of RC2. Learning Curve markets and sells what it purports to be "developmental toys that engage children, and provide parents with peace of mind, knowing their children are being inspired and enlightened by safe and quality playthings." Learning Curve brands include The First Years®, Lamaze®, John Deere Kids™, Thomas & Friends™ and Bob the Builder, among others. Learning Curve is responsible for the licensing, marketing, and distribution of the toys, collectibles, and infant and toddler and preschool products manufactured by RC2 Corporation. These products include the VPBPs at issue. In 2003, shortly after its acquisition by RC2 Corporation, Learning Curve Brands issued a recall of 3,800 activity toys due to unsafe levels of lead in the paint. Moreover, in 2007, Learning Curve issued two recalls for 1.5 million Thomas & Friends toys painted with red and yellow surface paint containing lead. Learning Curve was formerly known as The Ertl Company, Racing Champions, Ertl, Inc., RC Ertl, Inc. and RC2 Brands, Inc.

12.     Medela, Inc. is a Delaware corporation with its principal place of business located at 1101 Corporate Drive, McHenry, Illinois 60050.

3

### III.   JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because at least one member of the class is a citizen of a different State than the Defendants, there are 100 or more class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and cost.

14.     Venue is properly set in this District pursuant to 28 U.S.C. § 1391(a) because one or more Defendants reside, transact business, and are found within this District, and a substantial part of the events giving rise to the claims at issue in this Complaint arose in this District.

### IV.   FACTUAL ALLEGATIONS

#### A.   VPBPs

15.     Vinyl (the common name for the polymer polyvinyl chloride) is a versatile and durable material used in a variety of household products, including toys, children's accessories, and Defendants' VPBPs.

16.     Vinyl, to hold together, needs a metal as a binding agent. In the U.S., the metal of choice often is tin, calcium, barium or zinc. In fact, according to the Vinyl Institute, a trade group based in Arlington, Va., the vinyl industry in the United States stopped using lead in plastic years ago and instead uses tin, calcium, barium or zinc as a stabilizer to provide durability.

17.     But lead or cadmium—far more reactive and harmful—are cheaper. Thus, imported vinyl products from China and other overseas locations still contain lead.

#### B.   Overview of Lead Poisoning

##### 1.   Effects of lead on children

18.     Lead in VPBPs is invisible to the naked eye and has no smell. Yet, lead is known to be very dangerous to human beings. Essentially, lead lodges in the bone or skeletal structure

4

of the body and certain events can cause it to latently move into the blood stream and cause significant difficulties.

19.     The U.S. Center for Disease Control has set a blood lead "level of concern" of a mere 10 micrograms per deciliter of blood (a microgram is 1/1,000,000th of a gram and a deciliter is 1/10th of a liter or about 1/10 of a quart), and new research suggests that serious health effects may begin to set in with blood levels as low as 5 micrograms per deciliter.

20.     On average, children under six will absorb and/or retain about 50 percent of the lead they ingest. Lead poisoning during the first three years of a child's life can critically impair brain and nervous system development. Young children are the most vulnerable to poisoning by lead, due in large part to the fact that their brains and nervous systems have yet to fully form. The direct effects of pediatric lead poisoning can include reading disabilities, attention deficit, hyperactivity, behavioral problems, stunted growth, hearing impairment and damage to the kidneys and greater demand for medical care generally to treat those problems. If exposed to higher levels, young children may suffer from mental retardation, fall into a coma, or die.

21.     Health officials figure lead use in gasoline and paints skimmed five to 10 IQ points from every child growing up in the United States in the 1970s. New research suggests that the so-called "natural" decline in mental capacity afflicting many older people is instead a function of lead exposure decades earlier, as children and young adults.

22.     The American Academy of Pediatrics has thus concluded that there is "no known safe level of lead exposure."

23.     Because the body absorbs lead over time, even small amounts of lead can have negative effects. There is no study that has established a blood level for lead that does not impair child cognition.

5

24.     Children can be exposed to lead through such things as contaminated dust, paint chips, or lead-based products. Children may be exposed to lead from consumer products through normal hand-to-mouth activity, which is part of their development. Children often place toys, fingers, and other objects in their mouth, exposing themselves to lead dust.

25.     According to the National Safety Council, it only takes the lead dust equivalent of a single grain of salt for a child to register an elevated blood lead level.

26.     A universally recognized method for testing lead levels is a blood test. The reliability of blood lead testing comes from, in part, the capability of comparing blood lead test results, especially for children, to the published standard of 10 µg/dl, established by the Center for Disease Control ("CDC").

27.     Blood lead testing is also useful in signaling a need for further medical examinations, which can lead to a more definite diagnosis.

### 2.    Effects of Lead Poisoning on Society

28.     While it is clear that lead poisoning has a drastic effect on the children and families who suffer from its devastating physiological and neurological effects, there are public costs as well.

29.     The annual costs of environmentally attributable diseases in American children total $54.9 billion, of which the vast majority arises from lead poisoning. It is estimated that the total cost of lead poisoning in the U.S. each year is $43.4 billion. *See* Landrigan, Philip J. et al., "Environmental Pollutants and Disease in American Children: Estimates of Morbidity, Mortality, and Costs for Lead Poisoning, Asthma, Cancer, and Developmental Disabilities," Environmental Health Perspectives (Vol. 110, No. 7, July 2002).

6

### C.    Lead in Defendants' VPBPs

30.    High levels of lead were found in defendants' VPBPs by an environmental group based in California, the Center for Environmental Health ("CEH"), that spread the word about lead in vinyl baby bibs, lunchboxes, and other children's products.

31.    CEH purchased VPBPs in January 2008 from Target and Babies "R" Us stores in the San Francisco Area. CEH found a vinyl cooler for stored breast milk with high levels of lead from a "Pump in Style" breast pump made by Medela; also with high lead levels was a carrying case that came with a First Years "Natural Transitions" breast pump made by RC2 Brands, Inc., makers of Thomas and Friends products; and a Playtex "Fridge to Go" vinyl baby bottle cooler.

32.    CEH tested each of the VPBPs first with a hand-held metal detector and then at a laboratory. The products were found to have from 1,100 parts per million of lead to 5,500 parts per million of lead, the group says. CEH has informed the producers of the products. "Parents would never expect that when storing breast milk for their newborn, it could be contaminated by lead," said Michael Green, Executive Director of CEH. "There is no reason to have lead in baby products or anything used to hold breast milk for infants."

33.    CEH is recommending that parents discard the vinyl coolers and vinyl cases used for storing breast milk, pacifiers, or other infant products.

34.    Despite the obvious and serious dangers of lead contamination of infants, none of the Defendants has instituted a recall of the products.

### D.    Defendants' Knowledge of the Danger of Lead in Children's Products

35.    The Consumer Product Safety Commission ("CPSC") is supposed to take steps to prevent children from being exposed to hazardous lead and cadmium (and any other substance) in consumer products under the Consumer Product Safety Act ("CPSA"), 15 U.S.C. §§ 2051-84, and the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§ 1261-78.

36. In 1978, the CPSC banned paint containing in excess of 0.06% lead by weight intended for consumer use. At the same time, it also banned toys and other articles intended for use by children that use paint with a lead content in excess of 0.06% because they present a risk of lead poisoning to young children. *See* 16 C.F.R. Part 1303.

37. Both the United States House and Senate have passed versions of an amendment to the CPSA that would put a limit on the total amount of lead that could be in children's products, no matter the materials. The Senate amendment passed by a vote of 79-13, while the House amendment passed unanimously. Both the Senate and House versions would ultimately forbid the sale of products with levels of lead higher than 100 parts per million, levels which are exceeded by the Defendants' VPBPs *by 11 to 55 times. See* H.R. 4040; S. 2663.

38. Since 1973, Illinois has prohibited the sale of any children's products containing lead at a level of 600 parts per million. *See* 410 ILCS 45 (Lead Poisoning Prevention Act). Legislation is currently under consideration in the Illinois General Assembly which would lower the permissible level to 40 parts per million. *See* Ill. H.B. 5705, 5789, S.B. 2868.

39. Twenty-three other states have already enacted or are considering legislation setting permissible levels of lead well below the levels found in the vinyl coolers and cases. For example, legislation enacted in Washington state sets the permissible level of lead in children's products to a maximum of 90 parts per million, and possibly as low as 40 parts per million, *see* Wash. H.B. 2647, and similar legislation is under consideration in California, *see* Cal. A.B. 2694 (setting permissible level of lead at 40 parts per million).

40. Thus, since at least 1973, Defendants have been on notice of the dangers of lead in children's products. Yet despite this knowledge, they continue to market products as "safe" when in fact they are not safe and contain lead.

8

**E.    Defendants' Marketing of VPBPs**

41.    Defendants' marketing campaigns are built around assuring parents that their products are safe for children.

42.    For example, on their website, RC2 and Learning Curve state:

a.    "*We understand that what matters most to parents is keeping their children healthy, happy and safe*. What matters most to us is helping parents do just that by offering products for every stage of your child's development . . . ."

b.    "Learning Curve offers developmental toys that engage children, and provide parents with peace of mind, knowing their children are being inspired and enlightened by *safe and quality playthings*." (emphasis supplied).

c.    "From breast pumps to pacifiers and sippy cups, The First Years by Learning Curve provides *high-value* feeding items to nurture your child." (emphasis supplied).

d.    "*Nothing is more important to us than ensuring that children's products are safe*. We take our product safety responsibilities very seriously, and the measure of our success is the trust parents are able to place in our products, knowing that we're taking the right steps to protect children." (emphasis supplied).

43.    On its website, Medela states, *inter alia*: "For over 25 years, it has been the commitment of Medela to provide the *highest quality breastfeeding and breast pumping products* available for mothers and professionals" (emphasis supplied).

44.    Playtex provides this Q&A on its website:

Q7.    What measures does Playtex maintain to regulate quality and safety?

A7.    Our global manufacturing facilities are monitored by our Quality Assurance team and expert engineers. The Quality Assurance team includes

9

experts with a minimum of 5 years of consumer product experience and a technical background.

\*                \*                \*

Q10. Are the plastics and materials in Playtex® Infant feeding and soothing products safe for food contact application?

A10. *All Playtex® Infant Care products contain materials that are safe for food contact application. We hold ourselves to a higher standard when it comes to infant safety.* Playtex conducts tests of its products, and we only release products for sale that surpass the most stringent domestic and international regulatory guidelines on this and other safety matters. All materials are tested to ensure functional safety and performance and are tested or certified to meet material safety standards. Material testing is performed by a third party laboratory. (emphasis supplied).

45.    However, despite their clear representations that the VPBPs were safe for children, Defendants distributed VPBPs tainted with lead.

**F.    The Class's Damages**

46.    The very children to which Defendants marketed their products as safe have now been exposed to poisonous lead that can cause serious long-term injury.

47.    Plaintiffs are not seeking some unspecified product from Defendants, but rather reimbursement for the cost of the defective and dangerous VPBPs. They are outraged that Defendants failed to determine that their baby products were contaminated by lead. Plaintiffs have no faith in the capacity of Defendants to provide a safe replacement product to their children and instead seek a full refund for the purchases made by them and the Class.

10

48.     Moreover, as a result of Defendants' negligent and reckless conduct, Plaintiffs' children and the Class have been significantly exposed to a known hazardous substance. As a result of such exposure, the children are at an increased risk of being poisoned by lead. Accordingly, Plaintiffs also seek to recover the costs of diagnostic testing necessary to detect lead poisoning to their children resulting from Defendants' actions.

## V.    CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and a class ("Class") defined as:

> All persons or entities who purchased (a) a vinyl cooler for storing breast milk made by Medela; (b) a carrying case for a First Years "Natural Transitions" breast pump made by RC2; or (c) a Playtex "Fridge to Go" vinyl baby bottle cooler.

Excluded from the Class are Defendants and any entities in which Defendants have a controlling interest; any entities in which Defendants' officers, directors, or employees are employed and any of Defendants' legal representatives, heirs, successors, or assigns; the Judge to whom this case is assigned and any member of the Judge's immediate family; and all persons or entities who properly execute and timely file timely requests for exclusion from the Class.

50.     Plaintiff, on behalf of herself and the other members of the Class, seeks to recover damages and/or refunds from Defendants for consumer fraud under the Consumer Fraud laws of the 43 states and other state statutes for Defendants' false promises or concealment of material facts regarding the safety and composition of their VPBPs.

51.     This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23 of the Federal Rules of Civil Procedure.

11

52.    The requirement of Rule 23(a)(1) is satisfied here because the Class is so numerous that the individual joinder of all its members, in this or any action, is impracticable. The exact number or identification of Class members is presently unknown to Plaintiff, but it is believed that Class members number at least in the thousands. The identity of Class members is ascertainable. Class members may be informed of the pendency of this Class action by a combination of direct mail and public notice, or other means.

53.    The "commonality" requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact which are common to Plaintiff and each of the other members of the Class she seeks to represent. Those questions predominate over questions affecting only individual Class members. These questions include, but are not limited to:

a.    Whether Defendants concealed, suppressed, or omitted any material fact with intent that consumers rely on such concealment, suppression, or omission in connection with the sale or advertisement of any merchandise;

b.    Whether Plaintiff and the other members of the Class suffered any ascertainable loss of money or property as a result of Defendants' concealment, suppression, or omission of material fact;

c.    Whether, as a result of Defendants' negligent and reckless conduct, children have been significantly exposed to a known hazardous substance;

d.    Whether early detection, through medical testing of children, of lead poisoning is made necessary and advisable by the Defendants' manufacturing, marketing, and sale of the VPBPs;

e.    Whether Defendants are refusing to pay for the costs of lead testing;

f.    Whether Plaintiff and Class members are entitled to injunctive relief; and

12

g. Whether Plaintiff and other members of the Class are entitled to recover damages, including refunds, treble damages, interest, attorneys' fees, filing fees, and reasonable costs of suit for Defendants' injury to them.

54.    Plaintiff's claims are typical of claims of the other Class members because they each arise from the same course of conduct by Defendants and are based on the same legal theories. Moreover, Plaintiff seeks the same forms of relief for herself as she does on behalf of absent Class members. Accordingly, Plaintiff has satisfied the "typicality" requirements of Rule 23(a)(3) with respect to the Class she seeks to represent.

55.    Because her claims are typical of the claims of the other Class members she seeks to represent, Plaintiff has every incentive to vigorously pursue those claims. Plaintiff has no conflicts with, or interests antagonistic to, the other Class members. Plaintiff's commitment to the vigorous prosecution of this action is reflected in her retention of competent counsel experienced in litigation of this nature to represent her and the other Class members. Plaintiff's counsel will fairly and adequately represent the interests of the proposed Class and (a) have identified and thoroughly investigated the claims set forth herein; (b) are highly experienced in the management and litigation of class actions and complex litigation in general, including litigation of similar types of claims; (c) have extensive knowledge of the applicable law; and (d) possess the resources to commit to the vigorous prosecution of this action on behalf of the proposed Class. Accordingly, Plaintiff satisfies the adequacy of representation requirements of Rule 23(a)(4) with respect to the proposed Class.

56.    In addition, this action meets the requirements of Rule 23(b)(1). Absent a representative class action, members of the proposed Class would continue to suffer the harms described herein, for which they would have no remedy. Even if separate actions could be

13

brought by individual Class members, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated Class members, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants.

57.     This action also meets the requirements of Rule 23(b)(2), in that Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making final injunctive or corresponding declaratory relief with respect to the Class appropriate.

58.     This action additionally meets the requirements of Rule 23(b)(3). Common questions of law or fact, including those enumerated above, exist as to the claims of all members of the Class and predominate over questions affecting only individual Class members, and a class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit large numbers of similarly-situated persons to prosecute their respective class claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. Furthermore, while damages to the Class are substantial in the aggregate, the damages to any individual Class member may be insufficient to justify individually controlling the prosecution of separate actions against Defendants.

59.     This case is manageable as a class action, and a class trial will be manageable. Notice may be provided to Class members by First Class United States Mail and/or through the alternative means of publication and the Internet.

14

## VI.   CLAIMS ALLEGED

### FIRST COUNT
### (Unfair and Deceptive Acts and Practices)

60.    Plaintiff incorporates the allegations contained in each of the above paragraphs as if fully set forth herein.

61.    The consumer protection and unfair and deceptive trade practices laws of 43 jurisdictions in the United States prohibit deceptive acts or practices in the conduct of any business trade or commerce or in the furnishing of any service and authorize a private right of action against defendants that violate those laws.[1]

62.    As alleged above, Defendants' course of conduct is deceptive, because Defendants failed to disclose that their VPBPs contained lead, which is likely to mislead or has the capacity to mislead consumers, including Plaintiff and the other members of the Class.

---

[1] The state statutes Defendants are alleged to have violated are: **Alaska** (Alaska Stat. §§ 45.50.471 *et seq.*); **Arizona** (Ariz. Rev. Stat. § 44-1522); **Arkansas** (Ark. Code. §§ 4-88-107 and 4-88-108); **California** (Cal. Civ. Code § 1770(a)(19) and Cal. Bus. & Prof. Code §§ 17200 and 17500); **Colorado** (Colo. Rev. Stat. § 6-1-105(u)); **Connecticut** (Conn. Gen. Stat. § 42-110(b); **Delaware** (6 Del. Code § 2513); **District of Columbia** (D.C. Code § 28-3904(e),(f)); **Florida** (F.S.A. § 501.204); **Hawaii** (Haw. Rev. Stat. § 480-2(a)); **Idaho** (Idaho Code § 48-603(17),(18)); **Illinois** (815 Ill. Comp. Stat. 505/2); **Indiana** (Ind. Code § 24-5-0.5-3(a)); **Kansas** (Kan. Stat. §§ 50-626(a),(b) and 50-627(a)); **Kentucky** (Ky. Rev. Stat. § 367.170); **Maine** (Me. Rev. Stat. tit. 5, § 207); **Maryland** (Md. Code Com. Law § 13-301(1),(3)); **Massachusetts** (Mass. Gen. Laws ch. 93A, §§ 2(a) and 9); **Michigan** (Mich. Stat. § 445.903(1)(s),(bb),(cc)); **Minnesota** (Minn. Stat. §§ 8.31 and 325F.67 and 325F.69(1)); **Missouri** (Mo. Rev. Stat. § 407.020); **Nebraska** (Neb. Rev. Stat. § 59-1602); **Nevada** (N.R.S. 598-0915(5),(15) and 598.0923(2)); **New Hampshire** (N.H. Rev. Stat. § 358-A:2); **New Jersey** (N.J.S.A. § 56:8-2); **New Mexico** (N.M.S.A. §§ 57-12-2(14),(17) and 57-12-3); **New York** (N.Y. Gen. Bus. Law § 349); **North Carolina** (N.C. Gen. Stat. §§ 75-1.1); **North Dakota** (N.D. Cent. Code §§ 51-15-02); **Ohio** (Ohio Rev. Code §§ 1345-02(A) and 1345-03(A) and 4165.02(7),(11) and §4165.03); **Oklahoma** (Okla. Stat. tit. 15, §§ 752 and 733 and tit. 78, § 53(9)); **Oregon** (Or. Rev. Stat. §§ 646.607(1) and 646.608(1)(i),(t),(u) and 646.608(2)); **Pennsylvania** (73 P.S. §201-2(1)(ix), 201-2(4)(xiv)); **Rhode Island** (R.I. Gen. Laws §§ 6-13.1-1(6)(ix),(xiii),(xiv) and 6-13.1-2); **South Dakota** (S.D. Codified Laws § 37-24-6(1)); **Tennessee** (Tenn. Code Ann. § 47-18-104(a)); **Texas** (Tex. Bus. & Com. Code Ann. §§ 17.46(b)(9),(24) and 17.50); **Utah** (UCA 1953 §§ 13-11-4(1) and 13-11-5(1)); **Vermont** (Vt. Stat. Ann. tit. 9, § 2453(a)); **Washington** (RCWA §§ 19.86.020 and 19.86.920); **West Virginia** (W.Va. Code §§ 46A-6-102(b)(I),(L),(M) and 46A-6-104); **Wisconsin** (W.S.A. §§ 100.18 and 100.195 and 100.20 and 100.207); and **Wyoming** (WS § 40-12-105(a)(x),(xv)).

15

63.    As alleged above, Defendants omitted material facts about their VPBPs, with the intent that Plaintiff and the other members of the Class would rely on such omissions.

64.    Defendants' conduct violates the consumer protection and unfair and deceptive acts and practices laws of each of the 43 jurisdictions at issue, and their deceptive acts and practices are continuing and will continue unless they are permanently enjoined. Plaintiff and members of the Consumer Protection Class have suffered injury as a direct and proximate result of Defendants' conduct, and Defendants are liable for compensatory and treble or other punitive damages, costs and attorneys' fees as each respective jurisdiction may permit, in amounts to be proved at trial.

65.    As alleged above, Defendants' course of conduct is also unfair: Defendants' conduct caused Plaintiff and the other members of the Class unjustified, substantial injuries which they could not avoid because of Defendants' material omissions; or such actions offend public policy, are immoral, unscrupulous, unethical, and offensive, and thereby cause substantial injury to consumers, including Plaintiff and the other members of the Class.

66.    Plaintiff and the other members of the Class have each suffered injury in fact and monetary loss as a direct and proximate result of Defendants' conduct, including but not limited to, the monies paid to purchase their VPBPs. But for Defendants' course of conduct, including the misrepresentations and/or omissions alleged above, Plaintiff and the other members of the Class would have not purchased Defendants' VPBPs.

67.    Plaintiff and the other members of the Class are entitled to legal and equitable relief for Defendants' violation of each of the foregoing statutes, including, as applicable, damages, restitution, and/or disgorgement of all revenues, earnings, profits, compensation, and

16

benefits which Defendants may have obtained from their above-described unlawful course of conduct, and an Order enjoining Defendants to cease and desist from engaging in those practices.

### SECOND COUNT
### (Breach of Implied Warranty)

68.    Count II is brought by Plaintiffs, individually, and on behalf of all similarly situated residents of Alaska, Arkansas, Colorado, Delaware, Hawaii, Louisiana, Maine, Maryland, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia and Wyoming (hereinafter "Implied Warranty Subclass"). Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

69.    At all times, there were in effect the following statutes governing the implied warranty of merchantability: Alaska Stat. § 45.02.314; Ark. Code Ann § 4-2 314; C.R.S. § 4-2-314; 6 Del. C. § 2-314; H.R.S. § 490:2-314; § 554.2314; 11 M.R.S.A. § 2 314; Md. Code Ann. Art. 95B § 2-314; Mass. Gen. Laws Ch. 106 § 2-314; Miss. Code. Ann. § 75-2-314; M.C.A. 30-2-314; Neb. U.C.C. 2-314; N.R.S. 104.2314; N.J.S.A. 12A:2-314; N.D.C.C. 2-314; O.S. 1991 § 2-314; R.I. Gen. Laws 1956 §6A-2-314; S.C. Code Ann. § 36-2-314; S.D.C.L. 57A-2-314; Tex. Bus. & Com. Code Ann. § 2-314; Va. Code § 8.2-314; W. Va. Code § 46-2-314; and Wyo. Stat. 34.1-2-314.

70.    As designers, manufacturers, producers, marketers and sellers of toys, collectibles and juvenile and baby products, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

71.    The VPBPs are "goods," as defined in various states' commercial codes governing the implied warranty of merchantability.

17

72.     Implied in the sale of the VPBPs is a warranty of merchantability that requires, among other things, that the VPBPs pass without objection in the trade and are of merchantable quality and safe and fit for such use by young children.

73.     Because the VPBPs are defective and inherently dangerous, as a result of containing lead, the VPBPs are not able to function in their ordinary capacities and were therefore not merchantable at the times they were sold, as impliedly warranted by Defendants.

74.     Due to Defendants' wrongful conduct as alleged herein, Plaintiffs and members of the Class could not have known about the risks associated with the VPBPs.

75.     By virtue of the CEH's announcements and direct contact by the CEH, Defendants were put on notice of the defect in the VPBPs.

76.     Defendants were also put on notice of the defect in the VPBPs by the numerous inquiries that they received concerning the defects.

77.     As a direct and proximate result of the Defendants' breach of implied warranty, Plaintiffs and members of the Class suffered damages as alleged herein.

## THIRD COUNT
### (Negligence)

78.     Count III is brought by all Plaintiffs, individually and on behalf of the Class. Plaintiffs incorporate by reference all other paragraphs of this complaint as if fully set forth here.

79.     Defendants had a duty to exercise reasonable care in the design, manufacture, sale, and/or distribution of the VPBPs into the stream of commerce, including a duty to assure that these products did not expose children to adverse health effects including, without limitation, IQ deficits, learning disabilities, behavioral problems, stunted growth or slowed growth, impaired hearing, kidney damage, mental retardation, and even death from lead poisoning.

18

80.    Defendants failed to exercise ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, and/or distribution of the VPBPs into interstate commerce in that Defendants knew or should have known that the VPBPs created a high risk of adverse health effects which can cause extraordinary suffering and even death. Defendants' failure to exercise reasonable care in the design, manufacture, sale, and/or distribution of the VPBPs was grossly negligent.

81.    Specifically, Defendants were grossly negligent in the design, manufacture, testing, advertising, warning, marketing, and/or sale of the VPBPs in that they:

a.    Failed to use due care in designing and manufacturing the relevant products so as to avoid the aforementioned risks to children;

b.    Failed to accompany their products with proper warnings regarding all possible adverse effects associated with young children's handling and mouthing of, and otherwise being exposed to, the relevant products;

c.    Failed to conduct adequate testing and post-marketing surveillance to determine the safety of the relevant products;

d.    Failed to warn Plaintiffs and members of the Class prior to actively encouraging the sale of the VPBPs either directly or indirectly, orally or in writing, about the following: (1) the possibility that young children handling or otherwise exposed to the VPBPs could suffer adverse health effects as described herein, and/or (2) the possibility of affected children requiring hospitalization and/or continuous medical monitoring as a result of exposure to the VPBPs; and

e.    Were otherwise careless or grossly negligent.

82.     Despite the fact that Defendants knew or should have known that the VPBPs could cause unreasonable, adverse health effects to children, Defendants continued to market the relevant products to consumers including Plaintiff despite the possibility that these products could be produced without lead.

83.     Defendants knew or should have known that consumers such as Plaintiffs and the Class would foreseeably suffer adverse health effects and injury as a result of Defendants' failure to exercise ordinary care as described above.

84.     Defendants' negligence was a proximate cause of Plaintiffs' and the Class' economic damages, as well as their children's increased risk of harm as previously set forth herein.

### FOURTH COUNT
### (Unjust Enrichment)

85.     Plaintiff incorporates the allegations contained in each of the above paragraphs as if fully set forth herein.

86.     Defendants have received a benefit from Plaintiff and the other members of the Class in the form of the monies Defendants received from Plaintiff's and other Class members' purchases of their VPBPs during the period of time relevant to this action.

87.     Defendants have knowingly appreciated and accepted this benefit which has resulted and continues to result in an inequity to Plaintiff and the other members of the Class.

88.     Defendants' appreciation and acceptance of this benefit is inequitable.

89.     As a result of Defendants' unjust enrichment, Plaintiff and the other members of the Class sustained damages in an amount to be determined at trial. Plaintiff and the other members of the Class seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

20

WHEREFORE, Plaintiff, on behalf of herself and the other members of the Class, respectfully requests that the Court enter judgment against Defendants as follows:

a.    Entering an Order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, certifying the above-defined Class, and finding that Plaintiff is a proper Class representative, and that her counsel is adequate Class counsel;

b.    Entering an Order requiring Defendants to disgorge and make restitution for their unjust enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged above;

c.    Entering an Order requiring Defendants to pay damages in the amount of monies paid for the VPBPs, damages in the amount of monies paid or to be paid for lead testing of the children exposed to the VPBPs, as well as actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

d.    Ordering Defendants to pay Plaintiff's costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

e.    Such other relief as the Court may deem just.

Dated: June 10, 2008                              **HAGENS BERMAN SOBOL SHAPIRO LLP**

By: _____
      Elizabeth A. Fegan
      Timothy P. Mahoney
      Daniel J. Kurowski
      820 North Blvd, Suite B
      Oak Park, Illinois 60301
      (708) 776-5600
      (708) 776-5601 (fax)

      *Attorneys for Plaintiff*

21

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the other members of the Class, hereby demands a jury trial on all claims so triable in this action.

Dated: June 10, 2008                           **HAGENS BERMAN SOBOL SHAPIRO LLP**

By:_____
Elizabeth A. Fegan
Timothy P. Mahoney
Daniel J. Kurowski
820 North Blvd, Suite B
Oak Park, Illinois 60301
(708) 776-5600
(708) 776-5601 (fax)

*Attorneys for Plaintiff*

22